[No. G017435. Fourth Dist., Div. Three. Apr. 23, 1996.]

FREMONT COMPENSATION INSURANCE COMPANY et al.,
Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
MARAPPA V. GOPINATH et al., Real Parties in Interest.

## COUNSEL

Knapp, Petersen & Clarke, Paul Woolls and Antoinette S. Waller for Petitioners.

Daniel E. Lungren, Attorney General, Timothy G. Laddish, Assistant Attorney General, Jacqueline A. Schauer, James M. Robbins and Jerome M. Jackson as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Wylie A. Aitken and Annee Della Donna for Real Parties in Interest.

## OPINION

SILLS, P. J.—The nub of this case is whether relatively recent legislation to deter workers' compensation fraud left insurers with *less* protection to report insurance fraud to police and prosecutors than they had before the legislation was enacted. The answer is no.

The legislation resulted in the addition of section 1877.5 to the Insurance Code in 1991. (See Stats. 1991, ch. 116, § 19.) Section 1877.5 affords insurers a *qualified* immunity to report workers' compensation fraud to a local prosecutor or the Department of Insurance. The qualified immunity does not extend to reports made in bad faith.

This lawsuit was filed by a doctor who alleges that two workers' compensation insurers acted in bad faith in reporting the doctor for overbilling. However, the last sentence in Insurance Code section 1877.5 provides that "existing common law or statutory privileges and immunities" of insurers were not to be lessened by the statute. As we demonstrate below, another statute, section 47 of the Civil Code, already gives *everybody*—including insurers—the right to report crimes to the police, the local prosecutor or the appropriate regulatory agency, *even if* the report is made in bad faith. Accordingly, the insurers sued by plaintiff Marappa V. Gopinath for reporting him to the district attorney and the Department of Insurance fraud bureau for workers' compensation fraud are entitled to a writ of mandate commanding the superior court to sustain their demurrer to three of the five causes of action in Gopinath's complaint, namely those for interference with economic advantage, intentional infliction of emotional distress, and loss of consortium.

Two causes of action remain, one for malicious prosecution and the other for violation of the federal Racketeer Influenced and Corrupt Organizations

Act (civil RICO). Of these two, the malicious prosecution claim is not challenged in this writ proceeding. (There is no doubt that Civil Code section 47 does not affect malicious prosecution actions.) As to the civil RICO claim, while it might otherwise fall within the scope of Civil Code section 47's absolute immunity, the claim is, after all, based on a *federal* statute; and the parties have not briefed the question of how the federal RICO statute interacts with substantive state law. Since there is an obvious (but unbriefed) federal supremacy issue involved, the civil RICO claim will not be ordered dismissed in this particular writ proceeding.

### Background

As this proceeding involves a petition challenging an order overruling a demurrer, the facts, but not the conclusions, of the complaint are considered true for purposes of our review. Most of the story is told in two workers' compensation reports prepared by Dr. Gopinath and attached and incorporated into the complaint.

In 1990, a car salesman, Richard Moreno, was sent by his workers' compensation attorney to see a doctor, Marappa Gopinath, about a lower back injury sustained two years before, in 1988, when the salesman slipped and fell on a showroom floor. On the day of the examination, January 17, 1991, Dr. Gopinath wrote a workers' compensation report stating the patient's condition had deteriorated and he had become "increasingly symptomatic and painful." However, Dr. Gopinath concluded the injury was permanent and stationary and required no additional treatment.

The next day, January 18, the same car salesman saw Dr. Gopinath again, this time regarding a workers' compensation claim for a lower back injury that took place four days before—on January 14, 1991—when the salesman was lifting a desk. Dr. Gopinath wrote another workers' compensation report. That report noted the salesman had suffered a previous injury and recounted the salesman's statement that he had "continued symptoms with regards to his lumbosacral spine." The report further stated that the salesman told Dr. Gopinath "he was completely asymptomatic for at least two weeks prior to the above-stated trauma [that is, the January 14 injury]." The report concluded the salesman would need time to recover, and placed him on total temporary disability; the possibility of a disc injury could not be ruled out. The doctor also noted he was prescribing a course of physical therapy and gave the salesman prescriptions for antiinflammatory, analgesic and muscle relaxant drugs.

The first report went to one workers' compensation insurer, defendant Pacific Compensation Insurance company (whose parent company is

Fremont Compensation Insurance Company); the second report went to another, defendant Ohio Casualty/West American Insurance Companies. The two insurers found out about them when the salesman's attorney requested consolidation of the workers' compensation cases involving the two claims. Both claims were settled within the workers' compensation system in June 1991.

In February 1992, the two insurers reported Dr. Gopinath to the Department of Insurance and the Los Angeles District Attorney's office for insurance fraud for billing both companies for a *single* incident, and changing the date on the two reports to show two different injuries. The doctor was arrested and tried for presenting multiple claims for the same injury.[1]

Dr. Gopinath was acquitted. As explained in the complaint, it turned out that the first appointment had been scheduled in December 1990, before the January 14, 1991, injury, and when the salesman showed up for that appointment on January 17, he told Dr. Gopinath's receptionist of the January 14 injury. However, since Dr. Gopinath did not have authorization from the salesman's attorneys to see him about the new injury at that time, the salesman never told the doctor or his assistant of the January 14 injury. After the examination, the receptionist contacted the salesman's workers' compensation attorney and got authorization for Dr. Gopinath to see him about that injury the next day. The receptionist never told the doctor of her conversation with the salesman.

After his acquittal, Dr. Gopinath filed a complaint against the two insurers. His arrest had obviously not been good for his practice. His complaint charged the two insurers with having instigated "an aggressive campaign" to destroy his career, beginning in June 1991, just after the workers' compensation cases were settled. In particular, the insurers were alleged to have known, in June 1991, that the salesman had sustained two separate injuries with two separate employers leading to two separate medical examinations.

The complaint listed five causes of action: interference with economic advantage, intentional infliction of emotional distress, malicious prosecution, civil RICO, and loss of consortium. The insurers filed a demurrer. The trial court overruled the demurrer, reasoning as follows: a statute enacted in 1991, section 1877.5 of the Insurance Code,[2] provides insurers with certain immunity. That is, when insurers furnish information to a local district

---

[1]See former Insurance Code section 1871.1. See now Penal Code section 550; see also Insurance Code section 1871.4.

[2]All statutory references are to the Insurance Code except for section 47, which is to the Civil Code, and section 1859, which is to the Code of Civil Procedure.

attorney's office or the fraud claims bureau in the Department of Insurance, they are immune from "any civil liability in a cause or action of any kind"—*provided* they acted "in good faith, without malice, and reasonably believe[d] that the action taken was warranted by the then known facts, obtained by reasonable efforts."[3] In short, the statute only provides a qualified immunity. The complaint, however, alleged the insurers reported the doctor with malice, and, on demurrer, a court must assume that the allegations in the complaint are true. Moreover, the trial court reasoned, any immunity *otherwise* afforded the insurers by virtue of section 47 was eliminated by the specific existence of the Insurance Code statute, because the specific controls the general.

We summarily denied the insurers' petition for a writ of mandate commanding the trial court to vacate its decision and sustain the demurrer as to all causes of action except the one for malicious prosecution. The insurers then sought review by the Supreme Court; that court in turn issued an order commanding us to issue an alternative writ. Having now had the opportunity to study the matter in more detail, we must conclude that the demurrer should have been sustained as to three of the four challenged causes of action—namely those for interference with economic advantage, intentional infliction of emotional distress, and loss of consortium. We leave the civil RICO claim for another day.

### Section 1877.5 Does Not Lessen the Immunity Insurers Had Prior to Its Enactment to Report Insurance Fraud

█  There is no question that section 1877.5 limits the immunity *it* establishes to reports made without malice. The statute broadly exempts insurers from "any civil liability in a cause or action of any kind where the insurer . . . acts in good faith, without malice, and reasonably believes that the action taken was warranted by the then known facts." (Cf. § 1872.5 [immunizing insurers against any "relevant tort cause of action" by virtue of making certain reports "without malice"].)

---

[3] Here is the full text of section 1877.5:

"No insurer, or agent authorized by an insurer to act on its behalf, who furnishes information, written or oral, pursuant to this article, and no authorized governmental agency or its employees who (a) furnishes or receives information, written or oral, pursuant to this article, or (b) assists in any investigation of a suspected violation of Section 1871.1, 1871.4, 11760, or 11880, or of Section 549 of the Penal Code, or of Section 3215 or 3219 of the Labor Code conducted by an authorized governmental agency, shall be subject to any civil liability in a cause or action of any kind where the insurer, authorized agent, or authorized governmental agency acts in good faith, without malice, and reasonably believes that the action taken was warranted by the then known facts, obtained by reasonable efforts. Nothing in this chapter is intended to, nor does in any way or manner, abrogate or lessen the existing common law or statutory privileges and immunities of an insurer, agent authorized by that insurer to act on its behalf, or any authorized governmental agency or its employees."

In refusing to sustain the demurrer, the trial judge relied on the well-venerated rule of interpretation that the specific controls the general. (E.g., Code Civ. Proc. § 1859 ["a particular intent will control a general one that is inconsistent with it"]; *Woods* v. *Young* (1991) 53 Cal.3d 315, 325 [279 Cal.Rptr. 613, 807 P.2d 455] [" 'specific provision relating to a particular subject will govern a general provision' "].) So do the Gopinaths now. The idea is that by providing for immunity when fraud reporting is done in good faith, the statute necessarily implies that reporting (as alleged here) in bad faith enjoys no immunity. (*Expressio unius* and all that.) Accordingly, even if Civil Code section 47 did provide immunity for "bad faith" fraud reporting, it would be overridden by Insurance Code section 1877.5.

The rule that the specific controls the general, however, applies only when the specific and general provisions cannot be reconciled. (*People* v. *Wheeler* (1992) 4 Cal.4th 284, 293 [14 Cal.Rptr.2d 418, 841 P.2d 938] ["The principle that a specific statute prevails over a general one applies only when the two sections cannot be reconciled."]; *In re Ricardo A.* (1995) 32 Cal.App.4th 1190, 1194-1195 [38 Cal.Rptr.2d 586].) A close reading of Insurance Code section 1877.5 reveals that it *is* reconcilable with Civil Code section 47, even insofar as section 1877.5 relates to *insurers* reporting workers' compensation insurance fraud.

Section 1877.5 consists of two sentences; the good faith language is set forth in the first. But there is a second sentence, which was not addressed by the trial court.

"Nothing in this chapter"—which certainly includes the part about acting in good faith—is either "intended to, nor does in any way or manner, abrogate or lessen the existing common law or statutory privileges and immunities of an insurer." Plainly, *if* an insurer enjoyed a privilege to report workers' compensation insurance fraud (even in bad faith) prior to the enactment of Insurance Code section 1877.5, the language of the second sentence of section 1877.5 means that the insurer still had that privilege afterwards. By providing that section 1877.5 would not abrogate any existing statutory immunities, the statute becomes easily reconcilable with Civil Code section 47—assuming, of course, that section 47 afforded such immunities in the first place.

One might wonder, of course, why the Legislature should indulge in such redundancy. Why specifically establish an immunity for good faith fraud reporting yet retain existing immunity for bad faith reporting?

The answer is found in the nature of legislative compromise. Avoiding resolution of disputed points is one of the classic means by which legislators

are able to achieve agreement on legislative text. (See *California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 709 [170 Cal.Rptr. 817, 621 P.2d 856] (conc. opn. of Newman, J.) [legislative history may show "deliberate truncation of the purpose" or "choice of words resulted from some decision quite unrelated to the point at hand"]; *J.A. Jones Construction Co. v. Superior Court* (1994) 27 Cal.App.4th 1568, 1577 [33 Cal.Rptr.2d 206] ["if there is ambiguity it is because the legislature either could not agree on clearer language or because it made the deliberate choice to be ambiguous—in effect, the only 'intent' is to pass the matter on to the courts"]; Eskridge, *The New Textualism* (1990) 37 UCLA L.Rev. 621, 677 ["The vast majority of the Court's difficult statutory interpretation cases involve statutes whose ambiguity is either the result of deliberate legislative choice to leave conflictual decisions to agencies or the courts . . . ."].) Here, the second sentence of section 1877.5 appears to be the product of a legislative compromise to enact a qualified reporting privilege and leave to the courts the question of what reporting immunities might already exist.

Until today, no published decision has addressed the specific question whether section 47 provides unqualified immunity to insurers for reporting workers' compensation fraud. The interest groups and lobbyists who fought for only a qualified immunity in section 1877.5 had no reason to concede that insurers already had more than a qualified immunity to report workers' compensation fraud. In time-honored fashion, those groups and lobbyists were prepared to leave the question of the *existing* state of the law to the courts.[4]

The Gopinaths contend the second sentence in section 1877.5 refers to something other than reporting, though they do not say what. The idea is untenable in the context of the statutory scheme considered as a whole. Reporting is one of the key features of the Insurance Frauds Prevention Act; remarkably, reporting workers' compensation fraud is *mandated* by the act whenever an insurer "knows or reasonably believes" it knows the perpetrator of insurance fraud. (§ 1877.3, subd. (b)(1); cf. § 1872.4, subd. (a).)[5] Indeed, not only is reporting under such circumstances affirmatively imposed on insurers, but it must be done within 30 days after the duty to report arises. (§ 1877.3, subd. (d).) The context of the qualified immunity is thus fraud

---

[4]Gopinath attached to his opposition to the demurrer excerpts from a legislative history which indicate that the qualified privilege set out in the first sentence of section 1877.5 was the product of considerable attention by various interest groups. These excerpts, however, do not deal with the second sentence of the statute.

[5]And by law, insurers are required to maintain fraud units. Section 1875.20 provides in its entirety: "Every insurer admitted to do business in this state shall maintain a unit or division to investigate possible fraudulent claims by insureds or by persons making claims for services or repairs against policies held by insureds."

reporting, and the natural inference to be derived from that context is that the "existing" language refers to whatever privileges or immunities insurers had *as regards reporting*.

If there remains any doubt after consideration of the context, it is eliminated by the general purpose of the statute. The whole point of the act is to deter insurance fraud. It would be utterly anomalous for the Legislature to seek to curtail such fraud and, in the process, create a major disincentive that did not otherwise exist for insurers to report fraud.

## UNDER SECTION 47 INSURERS ARE ABSOLUTELY PRIVILEGED TO REPORT INSURANCE FRAUD TO EITHER THE LOCAL DISTRICT ATTORNEY OR THE DEPARTMENT OF INSURANCE

As interpreted in a number of cases, section 47 protects persons who report potential criminal activity to the police or local prosecutor from lawsuits, even if the report is made with malice. (E.g., *Cote* v. *Henderson* (1990) 218 Cal.App.3d 796, 806 [267 Cal.Rptr. 274] [defendant was "absolutely privileged" to report rape to police and district attorney]; *Williams* v. *Taylor* (1982) 129 Cal.App.3d 745, 753-754 [181 Cal.Rptr. 423] [owner of autoshop "absolutely privileged" to tell police department of former manager's wrongdoing].)

The privilege also extends to reports to quasi-judicial government authorities, such as administrative agencies regulating a particular business. (*Williams* v. *Taylor*, *supra*, 129 Cal.App.3d at p. 754 [defendant autoshop owner absolutely privileged to inform Department of Employment Development of reasons for shop manager's dismissal]; *O'Shea* v. *General Telephone Co.* (1987) 193 Cal.App.3d 1040, 1047-1048 [238 Cal.Rptr. 715] [telephone company privileged to tell highway patrol in course of statutorily authorized background check reason for ex-employee's termination].)

True, *Fenelon* v. *Superior Court* (1990) 223 Cal.App.3d 1476 [273 Cal.Rptr. 367] states a contrary rule as to reports made "solely" to the police. There, the plaintiff alleged that the defendants induced a third party to inform "police and other nonofficial persons" that the plaintiff had solicited the murder of one of the defendants. In a published opinion denying a writ petition after the defendants' demurrer was overruled, the majority held that "where the report is made solely to the police and not in a quasi-judicial context, to be privileged the statement must be made without malice." (*Id.* at p. 1483.)

The holding in *Fenelon* does not apply to the present case because the reports here were not made "solely to the police," but rather to the local

district attorney and Department of Insurance fraud bureau. The central point of the *Fenelon* majority was that reports *outside* a judicial or "quasi-judicial" context lacked "safeguards" such as notice, hearing and review. (See 223 Cal.App.3d at p. 1483, and particularly the quotation from *Toker* v. *Pollak* (1978) 44 N.Y.2d 211 [N.E.2d 163, 169, 405 N.Y.S.2d 1376].) But such, or similar, safeguards certainly inhere in reports to prosecutors and the Department of Insurance Bureau of Fraudulent Claims. As to prosecutors, by definition anything they do with a report of workers' compensation fraud (beyond, of course, investigating the claim), will entail notice, hearing and review. As to the fraud bureau, a statute specifically protects the person being investigated against "unwarranted injury" by making the bureau's investigation not subject to public inspection for the period of the investigation except insofar as the police or other law enforcement agency request it. (§ 1872.3, subds. (d) & (e).)

Moreover, even if *Fenelon* articulated a rule which did apply to this case, we would join *Passman* v. *Torkan* (1995) 34 Cal.App.4th 607, 616-619 [40 Cal.Rptr.2d 291] (letter of litigant to district attorney held absolutely privileged) and *Hunsucker* v. *Sunnyvale Hilton Inn* (1994) 23 Cal.App.4th 1498, 1502-1504 [28 Cal.Rptr.2d 722] (report to police by hotel manager concerning guest's possession of a gun held absolutely privileged) in respectfully declining to follow it. The *Fenelon* majority never grappled with the substantial California authority cited in the dissent demonstrating that the solid rule in California (at least up to the *Fenelon* decision) was that the absolute privilege "applies to statements made preliminary to or in preparation for either civil or criminal proceedings," which would include reports made solely to the police. (See *Fenelon* v. *Superior Court, supra,* 223 Cal.App.3d at p. 1484 (dis. opn. of Benke, J.); see also *Hunsucker, supra,* 23 Cal.App.4th at pp. 1502-1503 [". . . the weight of authority in California, the very articulate dissent in *Fenelon* by Justice Benke, and what we believe is the better view, holds that reports made by citizens to police regarding potential criminal activity fall within the section 47 absolute privilege."].)[6] Rather, *Fenelon* relied on out-of-state cases to depart from the rule articulated in *Williams* v. *Taylor, supra,* 129 Cal.App.3d 745. (See *Fenelon, supra,* 223 Cal.App.3d at pp. 1482 & 1482, fn. 8.)

The absolute privilege in section 47 represents a value judgment that facilitating the "utmost freedom of communication between citizens and

---

[6]As the Supreme Court observed in *Slaughter* v. *Friedman* (1982) 32 Cal.3d 149, 156 [185 Cal.Rptr. 244, 649 P.2d 886], the " 'official proceeding' privilege has been interpreted broadly to protect communications to or from *governmental* officials which may precede the initiation of formal proceedings." (Original italics.)

public authorities whose responsibility is to investigate and remedy wrongdoing" is more important than the "'occasional harm that might befall a defamed individual.'" (See *Imig* v. *Ferrar* (1977) 70 Cal.App.3d 48, 55-56 [138 Cal.Rptr. 540].) But even so, section 47 hardly leaves the wrongly defamed individual without safeguards. The malicious prosecution remedy always remains. Indeed, Dr. Gopinath's malicious prosecution cause of action survives this writ proceeding.

If section 47 provides immunity for false reports of rape (*Cote*) or employee theft (*Williams*), it necessarily follows that it also provides immunity for false reports of workers' compensation overbilling. The reason for the section 47 privilege—to facilitate the *utmost* freedom of communications between victims of crime and law enforcement agencies—applies, if anything, all the more so to insurance fraud, where the costs of the crime are indirectly borne by all consumers, employees and businesses, than it does to more localized crimes. (See § 1875.10, subd. (b) ["insurers and their policyholders ultimately pay the cost of fraudulent insurance claims"].)

## DISPOSITION

As mentioned above, this opinion does not deal with the malicious prosecution claim. Section 47 does not preclude malicious prosecution actions (*Kimmel* v. *Goland* (1990) 51 Cal.3d 202, 209 [271 Cal.Rptr. 191, 793 P.2d 524] [litigation privilege "has been interpreted to apply to virtually all torts except malicious prosecution"]; *Silberg* v. *Anderson* (1990) 50 Cal.3d 205, 216 [266 Cal.Rptr. 638, 786 P.2d 365] ["The only exception . . . has been for malicious prosecution actions."]; *Mattco Forge, Inc.* v. *Arthur Young & Co.* (1992) 5 Cal.App.4th 392, 406 [6 Cal.Rptr.2d 781] ["The privilege applies only to tort causes of action, and not to the tort of malicious prosecution."]), a point conceded at oral argument by counsel for the insurers.

Likewise, the civil RICO cause of action cannot be disposed of in this writ proceeding. To state the obvious, causes of action under the Racketeer Influenced and Corrupt Organizations Act are predicated on a federal statute. (18 U.S.C. §§ 1961-1968.) The parties have not briefed the question of how the state law we are construing in this opinion, section 47 of California's Civil Code, interacts with a cause of action based on the federal RICO statute in the context of the facts alleged. Suffice to say there is at least a colorable question as to whether the use of a state statute to dismiss a cause of action based on a federal statute would contravene the supremacy clause of the United States Constitution. Rather than address that question now, we defer the matter to another day.

A peremptory writ shall issue to the superior court commanding it to sustain defendants' demurrer without leave to amend as to all causes of action except the ones for malicious prosecution and civil RICO.

Wallin, J., and Sonenshine, J., concurred.