[No. G030304. Fourth Dist., Div. Three. June 23, 2003.]

FREDDIE CURTIS MOSBY, JR., et al., Plaintiffs and Appellants, v. LIBERTY MUTUAL INSURANCE COMPANY et al., Defendants and Respondents.

## COUNSEL

Duke L. Peters for Plaintiffs and Appellants.

Kern & Wooley, Susan T. Olson, Melodee A. Yee and Lisa K. Hansen for Defendant and Respondent Liberty Mutual Insurance Company.

Cloud & Olsen, Christopher T. Olsen and Scott B. Cloud for Defendant and Respondent Best Buy Company.

## OPINION

**SILLS, P. J.—**

### I. INTRODUCTION

Freddie Curtis Mosby and his wife Sheri Mosby have sued his employer, Best Buy, and his employer's workers' compensation insurer, Liberty Mutual Insurance Company, for malicious prosecution and loss of consortium in the wake of Liberty Mutual's reporting Mosby to the local district attorney for workers' compensation insurance fraud. (Criminal fraud charges against Mosby were dismissed after the preliminary hearing.) This case comes to us after the trial court sustained demurrers to the complaint without leave to amend.

We will affirm the judgment in favor of Best Buy. The little involvement that Best Buy has with this case was clearly a part of normal workers' compensation claims processing and therefore barred under the exclusivity provisions of the workers' compensation laws. (See generally *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800

[102 Cal.Rptr.2d 562, 14 P.3d 234].) Best Buy never stepped out of its role as employer. (See *Unruh v. Truck Insurance Exchange* (1972) 7 Cal.3d 616, 630 [102 Cal.Rptr. 815, 498 P.2d 1063] [origin of the "role" metaphor for workers' compensation exclusivity analysis].)

The judgment in favor of Liberty Mutual, however, must be reversed. It did step out of its role of insurer, and took on the persona of "bad cop." That is, a malicious, false accusation of workers' compensation fraud against a claimant is *not* part of the normal workers' compensation claims process. Unlike the abuse of process and fraud claims that were held to be within the exclusivity provisions of the workers' compensation laws in *Vacanti*, a malicious accusation of workers' compensation fraud made to the district attorney is not aimed at delaying or denying *payments*. In that regard, the Legislature has specifically indicated that malicious prosecution *is* a viable cause of action against workers' compensation insurers who make reports of workers' compensation fraud *with malice*.

## II. FACTS

The facts are drawn from the first amended complaint. We need not belabor the rule that on demurrer the facts in the complaint are assumed true and all reason able inferences from the complaint are drawn in favor of the plaintiff.

Mosby, who is African-American, began working for Best Buy in 1994. In 1997, he was employed as a supervisor. On April 16, 1997, Mosby was moving merchandise with a forklift when a box containing an air conditioning unit fell and struck him, causing his neck to extend backwards. Mosby stumbled but was prevented from falling by a safety belt that held him on the forklift.

As a supervisor, Mosby wanted to set a good example for his employees, and so continued working though he was having problems with his neck, left shoulder, and low back. But he also feared he might be fired if he reported the injury. After one week of constant pain and stiffness, he reluctantly filed a claim with Best Buy for on-the-job injury.

Mosby was sent to a medical center for treatment. He returned to work, but his medication and injuries interfered with his balance and ability to work. Best Buy then referred Mosby to Dr. Bill Yeung, who first examined Mosby on April 23. On May 28, Yeung removed Mosby from his work duties due to the injury. A subsequent magnetic resonance imaging (MRI) test conducted on June 3 revealed significant damage, including several herniated discs.

While in Yeung's office on June 3 awaiting results of his MRI, Mosby overheard a conversation between the doctor and an employee, "The only

way to straighten this guy out, is place a noose around his neck and kick the chair." Mosby understood this to be a "devastating racial remark." Mosby then sought treatment from his own physician, Dr. Reece, beginning on June 4.

Robynn Vannatta is a claims adjuster at Liberty Mutual, Best Buy's workers' compensation carrier. At the request of Best Buy, Vannatta arranged surveillance of Mosby beginning in mid-June. In July, Vannatta contacted Reece's office and had a conversation with his receptionist, during which Vannatta stated she had information that Mosby was a "liar." At some point, Vannatta stated that she believed the sign-in sheets at Reece's office were false, although surveillance revealed that Mosby was keeping his appointments with Reece.

Thereafter, Vannatta scheduled and directed Mosby to attend an examination with Dr. Ian Brodie, which Mosby characterizes as an illegal qualified medical examination in violation of the California Labor Code. Brodie concurred with Reece that Mosby had suffered a herniated disc and a pinched nerve. He nonetheless agreed to return Mosby to modified duty for four hours per day, with no lifting, bending, stooping or related activities. According to Mosby, such restrictions were inconsistent with any duty he could perform at Best Buy.

At a workers' compensation hearing in September, Mosby "learned" (the complaint does not reveal from whom he learned it) that the examination by Brodie was illegal and Brodie's recommendations should be ignored. Later that month, Mosby was evaluated by a neurosurgeon, who recommended surgical treatment. Mosby continued treatment from September 1997, until April 1998.

In April 1998, Mosby was sent to Dr. Stuart Green for an agreed medical examination. After a two-hour examination, Green gave Mosby a 55 percent permanent disability rating. Mosby alleges that Green's rating caused Liberty Mutual to become more vindictive and retaliatory. Liberty Mutual deposed Green and showed him surveillance tapes of Mosby walking up stairs the day of his evaluation. Green then changed his rating.

Liberty Mutual then stepped up its investigation of Mosby and, in October 1998, presented its case for fraud to the district attorney. On January 15, 1999, the district attorney filed a felony complaint against him and on February 19, Mosby was arrested. Liberty Mutual instigated the criminal complaint in spite of medical evaluations which supported Mosby's on-the-job injury. No less than three medical reports had verified his injuries and there was nothing to indicate that the injuries hadn't been sustained when the

air conditioner had fallen on him. Yet Liberty Mutual gave misleading information to the district attorney, including misleading testimony by one of its agents at the preliminary hearing. Vannatta went so far as to change Mosby's status from "temporarily disabled" to "permanent and stationary" for the purpose of making Mosby look more culpable and ensuring that the felony charges had some support.

Green, the doctor Liberty Mutual had hired to evaluate Mosby, stated in a letter that he "always harbored certain doubts about the validity of [his] assessment of Mr. Mosby," and would "feel far more comfortable as a witness for the defense in this case than in my present position as 'chief witness' for the prosecution." Green also told Mosby, "If it wasn't for your color, then it wouldn't have gone this far." After the preliminary hearing, *upon motion by the District Attorney*, the judge dismissed the criminal charges against Mosby in the interests of justice.

On June 28, 2001, Mosby and his wife, Sheri Mosby, filed the instant case for malicious prosecution against Liberty Mutual, Best Buy, and Green, seeking damages for the $3,500 the Mosbys spent defending the criminal action and for the loss of reputation attendant on his arrest and prosecution. The complaint alleges Liberty Mutual "knowingly submitted slanted and biased reports to Orange County District Attorney's Office alleging charges of insurance fraud." Mosby alleged malicious prosecution and Sheri Mosby alleged loss of consortium.

Both Best Buy and Liberty Mutual filed demurrers and motions to strike, arguing, inter alia, that the exclusivity provisions of the Workers' Compensation Act precluded both causes of action. The court sustained the demurrers and granted leave to amend, noting in its minute order that the allegations of racial discrimination were too conclusory. Moreover, the complaint failed to allege Mosby was so incapacitated he could no longer be a companion.

Mosby and Sheri Mosby filed a first amended complaint in October 2001, dropping Green as a defendant and adding Vannatta. Liberty Mutual and Best Buy again filed demurrers and motions to strike. The court ruled that the malicious prosecution action was within the compensation bargain, and because the loss of consortium claim was premised on the malicious prosecution claim, it also failed. The demurrers were sustained, the case was dismissed, and the Mosbys timely filed this appeal. On appeal, the Mosbys seek to have their first amended complaint reinstated. They do not request further leave to amend.

## III. DISCUSSION

█ An employee's right to recover against an employer is usually limited to remedies set forth in the Workers' Compensation Act. (Lab. Code, § 3201

et seq.) The exclusivity feature of the workers' compensation system is sometimes known as the "compensation bargain." (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 15–16 [276 Cal.Rptr. 303, 801 P.2d 1054].) The function of exclusivity, "is to give efficacy" to that bargain. (*Id.* at p. 16.) Under the deal, "the employer assumes liability for industrial personal injury or death without regard to fault in exchange for limitations on the amount of that liability. The employee is afforded relatively swift and certain payment of benefits to cure or relieve the effects of industrial injury without having to prove fault but, in exchange, gives up the wider range of damages potentially available in tort." (*Ibid.*) ██ The Legislature has extended the protection of these exclusive remedy provisions to workers' compensation insurance carriers by defining the word "employer" to include "insurer." (Lab. Code, § 3850, subd. (b).)

The contours of the exclusivity rule were most recently explored by our Supreme Court in *Vacanti, supra,* 24 Cal.4th 800. Taking its cue from the earlier *Unruh* decision, the court emphasized the scope of *normal* claims processing. Indeed, the word "normal" appears no less than 15 times in the opinion, and usually in connection with claims processing. ██ Thus, where "acts are 'a normal part of the employment relationship' [citation] or the workers' compensation claims process [citation], the cause of action is subject to exclusivity. Otherwise, it is not." (*Id.* at p. 820.)

██ Corollaries to this "normalcy" rule are that "[i]nsurer activity intrinsic to the workers' compensation claims process is also a risk contemplated by the compensation bargain" and "insurer actions 'closely connected to the payment of benefits' fall within the scope of the exclusive remedy provisions" of the workers' compensation laws. (*Vacanti, supra,* 24 Cal.4th at p. 821.) Thus it is not surprising that injuries "tethered" to the workplace, such as the psychic loss of termination of employment, or abusive conduct during the termination process, are within the exclusivity rule. (*Id.* at pp. 814–815.)

*Vacanti* itself was a case where a group of *doctors* sued several workers' compensation insurers for mishandling lien claims. (As the court acknowledged, it was a "novel complaint." See *Vacanti, supra,* 24 Cal.4th at p. 807.) With regard to the mechanics of *payment,* the mishandling was clearly within the exclusivity rule. Thus the doctors could not state abuse of process claims. Those claims arose out of a "pattern or practice of delaying or denying *payments* in bad faith." (*Id.* at p. 823, italics added.) The details of that bad faith included "frivolous objections, filing sham petitions and documents with the WCAB, issuing unnecessary subpoenas, and improperly threatening to depose plaintiffs' physicians." (*Ibid.*) Those actions were obviously part of the workers' compensation claims "process"—hence the title of the cause of action.

Likewise, the doctors in *Vacanti* could not state fraud claims based on "false statements about and during its processing of plaintiffs' lien claims." (*Vacanti, supra*, 24 Cal.4th at p. 823.) Again, the key was the "processing" of the "plaintiffs' lien claims," which is "closely connected to a normal insurer activity—the processing and payment of medical lien claims." (*Ibid.*)

On the other hand, the doctors' antitrust (Cartwright Act) action survived because it entailed allegations of influencing the processing of claims the defendant insurers did not insure—here the insurers were stepping out of the role of insurer. (*Vacanti, supra*, 24 Cal.4th at p. 825.) Additionally, Cartwright Act claims entail a motive element that violates fundamental public policy rooted in a statutory provision. (*Ibid.*)

So too did the doctors' "RICO" claims (see 18 U.S.C. § 1962(c)) survive, because the predicate acts of mail and wire fraud necessary to form a pattern of racketeering activity "cannot be closely connected to normal insurer activity." (*Vacanti, supra*, 24 Cal.4th at p. 827.) These were not acts committed "during the claims process." (*Ibid.*)

Finally, the doctors' tortious interference and unfair competition law causes of action were parsed: To the degree that those causes of action depended on individual acts that showed a pattern of mishandling the doctors' lien claims, they were like the abuse of process and fraud claims, i.e., "closely connected to a normal insurer activity—the *processing* of medical lien claims." (*Vacanti, supra*, 24 Cal.4th at p. 828.) On the other hand, to the degree the causes of action were based on misconduct involving claims that the individual insurers did not themselves insure, they were like the antitrust claims, and not connected to "normal insurer activity." (*Ibid.*)

*Vacanti* has come to stand for a standard two-step analysis of exclusivity. (See *Hughes v. Argonaut Ins. Company* (2001) 88 Cal.App.4th 517, 528 [105 Cal.Rptr.2d 877].) The first step is to determine whether the injury is " ' "collateral to or derivative of" an injury compensable by the exclusive remedies of the WCA ....' " (*Vacanti, supra*, 24 Cal.4th at p. 811.) If the injury meets that test, and is thus a candidate for the exclusivity rule, the second step is to determine whether the "alleged acts or motives that establish the elements of the cause of action fall outside the risks encompassed within the compensation bargain." (*Id.* at pp. 811–812.)

In the case before us, perhaps it can be said that the injuries from the allegedly malicious prosecution of Mosby were "derivative" of his workplace injury. There is, one must acknowledge, an attenuated for-want-of-a-nail-the-kingdom-was-lost "but for" relationship between the fact that an air conditioner fell on Mosby and his eventual prosecution for workers' compensation fraud.

■ But the alleged acts or motives in the malicious prosecution action here can hardly be said to be encompassed within the risks of the compensation bargain. Reporting alleged workers' compensation fraud is not an activity at all intrinsic to the claims handling process. (Most insurance claims, most of the time, never lead to criminal proceedings.) The normal workers' compensation claims process, in all its permutations, is concerned with compensation for what actually happened in the workplace. Reporting alleged fraud to the district attorney is a function of law enforcement.

■ The interest vindicated by malicious prosecution causes of action is an interest distinct from those protected in the workers' compensation bargain. That interest is the " 'freedom from unjustifiable and unreasonable litigation.' " (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 878 [254 Cal.Rptr. 336, 765 P.2d 498].) It is an interest which, as this case illustrates, is at once economic, psychic, and reputational: Being unfairly prosecuted inflicts a need to pay lawyers to mount a defense. It means the horrific uncertainty of litigation, with all the usual possibilities of things that can go wrong in litigation (about which good settlement judges always remind litigants). And it means the loss of reputation attendant upon the indignity of arrest and news of it to one's family, friends and coworkers.

The statutory duty of insurers to report cases of workers' compensation fraud is instructive as to the fundamental *abnormality* of fraud reporting. The duty was first fastened on insurers in 1991. (See Ins. Code, § 1877.3, subd. (b); Stats. 1991, ch. 116, § 19.) That itself is significant in considering exactly what is "normal" in workers' compensation claims processing. The late enactment of such a duty suggests that *fraud reporting* was not part of the historical workers' compensation "bargain." From 1913 to 1991 normal claims processing did not envisage any institutional linkage between the workers' compensation system and the criminal justice system.

■ But even if the independence of fraud reporting from the workers' compensation claims handling process were not enough, we cannot avoid the fact that in a related statute the Legislature has made it pretty plain that there should be no civil immunity for workers' compensation fraud reporting. (See Ins. Code, § 1877.5.) In pertinent part the statute reads: "No insurer ... who furnishes information, written or oral, pursuant to this article, ... shall be subject to any civil liability in a cause of action of any kind where the insurer ... *acts in good faith, without malice*, and reasonably believes that the action taken was warranted by the then known facts, obtained by reasonable efforts." (Italics added.)

As this court has recognized, there is no question that the statute leaves room for civil malicious prosecution claims. (See *Fremont Comp. Ins. Co. v.*

*Superior Court* (1996) 44 Cal.App.4th 867, 872 [52 Cal.Rptr.2d 211] ["There is no question that section 1877.5 limits the immunity *it* establishes to reports made without malice."].) And while the statute preserves all "existing common law or statutory privileges and immunities of an insurer," those common law and statutory privileges cannot be said to include immunity from malicious prosecution. In *Fremont*, for example, we noted that the immunity provided by Civil Code section 47 to report workers' compensation fraud to the police or district attorney did not extend to malicious prosecution. (*Fremont, supra*, 44 Cal.App.4th at p. 877 ["Section 47 does not preclude malicious prosecution actions."].) (Nor has any case up to now of which we are aware ever considered malicious reporting in the context of workers' compensation exclusivity, so it cannot be said that there was any "existing" common law immunity.)

 In short, the Legislature has made a policy decision to allow civil malicious prosecution claims to be filed against workers' compensation insurers if they maliciously reported workers' compensation fraud. We cannot square a *blanket* imposition of workers' compensation immunity with the clear import of Insurance Code section 1877.5. To do so would render the phrases "subject to any civil liability" and "without malice" in Insurance Code section 1877.5 surplus. If the Legislature had thought that *all* fraud reporting was within workers' compensation exclusivity, it would never have written the statute as it did.

We recognize, of course, that malicious prosecution *qua* malicious prosecution does not, alone, have as an *element* the existence of a motive that necessarily violates a fundamental public policy, such as, say, civil rights claims or the Cartwright Act claims in *Vacanti*. (We also recognize that, unlike the Cartwright Act and RICO (Racketeer Influenced and Corrupt Organiztions Act) claims in *Vacanti*, this lawsuit is brought against an insurer who *did* insure the plaintiff.) But it would be a misreading of *Vacanti* to say that any time a cause of action is not within workers' compensation exclusivity it must have as an element a motive contrary to public policy. The high court uses the disjunctive "or" in explaining the second *Vacanti* step: If acts are outside the *normal* workers' compensation claims process *or* if the motive violates a fundamental public policy the cause of action "may go forward." (*Vacanti, supra*, 24 Cal.4th at p. 812.) Actions outside normal claims processing are enough, as shown by the facts in *Unruh, supra*, 7 Cal.3d 616, where there also was no element of the cause of action contravening fundamental public policy. (Indeed, in that regard, *Unruh* applies a fortiori to this case, because the insurer stepped outside its role of insurer during the *investigation* of the claim. Here, the insurer acted outside its role of insurer in a process separate from investigation.)

Finally, we note the complaint includes allegations of racial animus by a doctor hired by Liberty Mutual to examine Mosby for workplace injuries, and makes other allegations that would further support a finding that Liberty Mutual showed racial bias. The elements of malicious prosecution include both lack of probable cause and malice (see *Sheldon Appel Co. v. Albert & Oliker, supra,* 47 Cal.3d at p. 871). Such allegations of bias are relevant to prove the *malice element* in *malicious prosecution.*

## IV. DISPOSITION

The judgment of dismissal in favor of Best Buy is affirmed. The judgment of dismissal in favor of Liberty Mutual is reversed. We hasten to add that our decision is limited only to the exclusivity issue. We express no opinion on the substance of any other issue.

In the interests of justice, the Mosbys shall recover their costs on appeal.

Moore, J., and Fybel, J., concurred.

Respondents' petition for review by the Supreme Court was denied October 15, 2003. Baxter, J., did not participate therein.