Bohn, J.
On March 13,1998, this matter was before the Court for hearing on the motion of defendant James N. Ellis, Jr. (“defendant") to Dismiss, to Disqualify Prosecuting Counsel, and for Other Appropriate Relief.[3] In support of his motion, the defendant argues that the forty-two indictments returned against him were obtained in violation of his right to a disinterested prosecutor, as guaranteed by the Due Process Clause of the Fourteenth Amendment, Articles 5, 6, 7, and 12 of the Massachusetts Declaration of Rights, and G.L.c. 12, §30. Specifically, the defendant argues that the legislative scheme which created an entity known as the Insurance Fraud Bureau (“IFB”), led to the formation of the Insurance Fraud Division of the Office of the Attorney General (“Fraud Division”), and assesses the insurance industry to fund indirectly the Fraud Division, injects impermissible private interests into the Fraud Division’s prosecutorial decisions. The defendant also seeks an evidentiary hearing on his motion, arguing that he is entitled to “prove the extent to which the prosecutors are encumbered by private interests and private influence.”
The Commonwealth opposes the defendant’s motion, arguing that the legislative funding mechanism is constitutional. Regarding the defendant’s request for an evidentiary hearing, the Commonwealth argues that the defendant has failed to make an adequate threshold showing that material facts are in dispute; and, in any event, the Commonwealth is willing to agree, for purposes of this motion, with the substance (but not tire relevance) of defendant’s factual statement. Accordingly, the Commonwealth argues, no evidentiary hearing is necessary.
Thus, the issues to be resolved by this Court are the following: has the legislative scheme at issue, and the relationship it has engendered between the IFB and the Fraud Division, deprived the defendant in this case of a fair and disinterested prosecution; if so, should the indictments returned against the defendant and his co-defendants be dismissed; and, is an evidentiary hearing necessary to resolve the first two issues. For the reasons which follow, the Court has determined that, based on the undisputed material facts set forth in the pleadings in this case and the arguments of counsel, no such deprivation occurred, *679 even if the underlying facts are construed in the manner the defendant urges. For that reason, the defendant’s motion to dismiss will be DENIED, as will his request for an evidentiary hearing.
BACKGROUND
The Court has read the defendant’s motion to dismiss, the memorandum in support of that motion, the Commonwealth’s opposition, the subsequent response and reply briefs, and the exhibits to those memoranda. Furthermore, it has heard and considered the arguments of counsel and has read and considered reported cases in the Commonwealth and elsewhere relevant to the issues presented in this motion. The following facts are based on those considerations, pleadings and arguments as well as reasonable inferences which can be drawn from those sources.
I. THE LEGISLATIVE SCHEME.
In December 1990, the Massachusetts General Court enacted St. 1990, c. 338,[4] which authorized the Automobile Insurers Bureau of Massachusetts (“AIB”) to create the IFB.[5] The AIB is a voluntary, non-profit association of Massachusetts automobile insurance companies, formed pursuant to G.L.c. 175A, §8, which represents the interests of those companies in regulatory and rate-making proceedings.[6] See Automobile Insurers Bureau of Massachusetts v. Commissioner of Ins., 415 Mass. 455, 456 n. 1 (1993). The IFB, a private investigative agency, see In the Matter of Ellis, 425 Mass. 332, 340 (1997), was established “for the prevention and investigation of fraudulent insurance transactions.” St. 1990, c. 338, §l(a).
When the IFB was first created, all costs of its operation were to be paid by the AIB.[7] St. 1990, c. 338, §l(d). The AIB, in turn, charged an assessment to its members based on a market-share formula. At the outset, the IFB’s thirteen-member board of governors included the Secretary of the Executive Office of Public Safety, the Registrar of Motor Vehicles, the Commissioner of Insurance, and ten members of the AIB’s governing committee. St. 1990, c. 338, §l(b).
Among other things, c. 338 granted the IFB access to confidential records, including those kept by the Registry of Motor Vehicles and insurance companies, as well as criminal offender record information. St. 1990, c. 338, §l(e). According to c. 338, §l(e), those records were to be accessed “solely for the use by such authorized personnel in the performance of their official duties and responsibilities within said insurance fraud bureau” and only when "relevant to any . . . insurance fraud bureau investigation.”
At the hub of the controversy now before the Court is St. 1990, c. 338, §1(1), which initially authorized the Commissioner of Insurance to levy an annual assessment against the AIB in the amount of $100,000, to “be utilized by the attorney general for the purpose of the investigation and prosecution of automobile insurance fraud matters referred to the attorney general by said insurance fraud bureau.” Concomitantly, c. 338 mandated that the Office of the Attorney General “designate at least one assistant attorney general who shall devote full-time to the investigation and prosecution” of fraud matters referred by the IFB. Id. Thus, the AIB not only paid for the operation of the IFB; it also provided money indirectly to the Office of the Attorney General for the prosecution of insurance fraud.
In December 1991, c. 338 was amended by St. 1991, c. 398, §99, as part of legislation designed to reform the workers’ compensation system as a whole. As amended, the act directed the IFB to investigate and prosecute workers’ compensation fraud as well as other fraudulent insurance transactions, including automobile insurance fraud. Chapter 398 also paired the Workers’ Compensation Rating and Inspection Bureau (“WCRIB”) with the AIB in the structure, operation, and financing of the IFB.[8] St. 1991, c. 398, §99, subsection 1(d). Similar in nature to the AIB, the WCRIB is a voluntary association of workers’ compensation carriers, formed pursuant to G.L.c. 152, §52C, which represents workers’ compensation carriers in rate-making and regulatory affairs.[9] As with the AIB, the WCRIB bases its membership fee and IFB costs assessment on a carrier’s market share.
The 1991 amendments also increased the membership of the IFB’s governing board to fifteen, adding the Secretary of the Executive Office of Labor, the Commissioner of the Department of Industrial Accidents, and five members of the WCRIB's governing committee, while reducing the AIB’s representation to five members. St. 1991, c. 398, §99, subsection 1(b). Through subsection 1(d), the executive director of the IFB was to publish “informational brochures” and establish a toll-free hotline in order to “encourage the public to report workers’ compensation fraud,” St. 1991, c. 398, §99, subsection 1(d); and, in subsection 1(e), the IFB was given access to a wider range of records for use during IFB investigations, adding those kept by the Department of Industrial Accidents, Department of Revenue, Department of Welfare,[10] Department of Employment and Training, and the WCRIB itself.
In addition to continuing the $100,000 annual assessment against the AIB, St. 1991, c. 399, §3 authorized the Commissioner of Insurance to assess the WCRIB the sum of $100,000 annually, to be “utilized by the attorney general for the purpose of the investigation and prosecution of automobile insurance fraud matters and workers’ compensation fraud matters.” Furthermore, the Office of the Attorney General was directed to designate at least two assistant attorneys general who would devote full-time to the investigation and prosecution of insurance fraud: one to focus on workers’ compensation fraud, another on *680 automobile fraud; and to designate additional assistant attorneys general if deemed necessary. Id.[11]
In 1995, the amount of the assessments against the AIB and WCRIB were revised upward, and for the first time, the levels were no longer equal.[12] Pursuant to St. 1995, c. 38, §210, subsection 3, the AIB was assessed $200,000, the WCRIB $368,602. The assessments continued to be for the use of the Office of the Attorney General in investigating and prosecuting automobile and workers’ compensation fraud matters. In addition to these fixed assessments, the AIB and WCRIB were to be assessed “an amount equal to the total amount of funds estimated by the secretary of administration and finance to be expended from the general fund for indirect and fringe benefit costs . . . attributable to personnel costs of the attorney general’s office related to [insurance fraud prosecutions under the act].” St. 1995, c. 38, §210, subsection 3.[13]
The newly-created Fraud Division was to include “at least” thirteen assistant attorneys general: six to prosecute automobile insurance fraud, and seven to prosecute workers’ compensation fraud. Again, the Office of the Attorney General could designate additional assistant attorneys general as necessary. Id.
II. THE IFB AND ITS REFERRAL SYSTEM.
Historically, the IFB investigative staff has been comprised mainly of former investigators from insurance company special investigative units,[14] and, from its inception, the staff was assembled to collect and review reports of suspected insurance fraud. By the terms of the legislation, insurers are required[15] to inform the IFB within 30 days if they have “reason to believe that an insurance transaction may be fraudulent, or [have] knowledge that a fraudulent insurance transaction[16] is about to take place, or has taken place.” St. 1991, c. 398, §99, subsection {1)(f). Upon receipt of such information, the IFB is required to review each report. After that initial mandatory review, the IFB is authorized, but not required, to conduct an investigation, including requesting production of documents and the testimony of witnesses,[17] and gaining access to the records described above.
The IFB also receives reports of fraud from governmental agencies, individual businesses, professional organizations, and insurance companies who are not members of either the AIB or WCRIB. Reports are also received via the toll-free hotline created to encourage the public to report suspected insurance fraud. Over the course of its first seven years, the IFB has received approximately 12,863 reports of insurance fraud: 6,566 of these reports came from insurance companies (51% of the total); 5,337 originated from the public (41% of the total).[18]
The IFB evaluates these reports and either accepts the report for investigation, transfers it to a more appropriate investigatory body, or declines to investigate the report. Of the more than 12,800 reports of suspected insurance fraud the IFB has received since its inception, it has accepted over 5,000 for investigation. Sixty-four percent (4,223) of these accepted reports have come from insurance companies. Only 7% (394) of the over 5,000 reports from the public were accepted. The overall average acceptance rate from 1991 to 1997 was 39%.
If, after investigating a report of fraud, the IFB is “satisfied that a material fraud, deceit, or intentional misrepresentation has been committed in an insurance transaction or purported insurance transaction, or that a violation [of the relevant laws] has occurred,” it must refer the case to either the Office of the Attorney General, District Attorney, or United States Attorney for prosecution. St. 1991, c. 398, §99, subsection l(i).[19] In doing so, the IFB has the discretion to determine where to refer a particular case among those offices, and bases its decision upon the nature of the fraudulent activity.
Since its inception, and out of the more than 12,000 reports received and 5,000 cases accepted for investigation, the IFB has referred some 1,204 cases of suspected insurance fraud for criminal prosecution. Of that number, 369 were referred to the Office of the Attorney General, 28 to the various District Attorneys within the Commonwealth, and 11 to the United States Attorney.[20] Of those cases, the Office of the Attorney General has accepted 86% of the IFB’s referrals; the District Attorneys, 79%; the United States Attorney, 91%.[21]
If not “satisfied” that a fraudulent insurance transaction has occurred, the IFB can close the case or refer it to another agency for further investigation. Finally, pursuant to St. 1991, c. 398, §99, subsection (1)(1), if an IFB referral results in a conviction, the perpetrator must make restitution to the insurance company/victim.
III. THE RELATIONSHIP BETWEEN THE IFB AND THE FRAUD DIVISION.
The Fraud Division, which was created in 1995 and has at all relevant times handled this criminal case, is the division within the Office of the Attorney General which is dedicated to the investigation and prosecution of insurance fraud. The assistant attorneys general in the Fraud Division devote themselves full-time to the prosecution of insurance fraud, as required by the legislative scheme, and receive referrals from a variety of sources, including concerned citizens, private attorneys, judges, state and federal agencies, other divisions within the Office of the Attorney General, the Department of Industrial Accidents, the WCRIB, the Public Employees Retirement Administration, the National Insurance Crime Bureau, the Social Security Administration, and the Commissioner of Insurance (pursuant to G.L.c. 175, §3A), as well as the IFB.
In furtherance of the legislative mandate to prosecute insurance fraud, the Fraud Division has estab *681 lished and maintained a close working relationship with the IFB. For example, the Attorney General, some of the assistant attorneys general involved in the prosecution of this case, and the chief of the Office of the Attorney General’s Business and Labor Protection Bureau have attended IFB board meetings to share progress, listen to frustrations (such as the September 1992, so-called “bottleneck” issue) and discuss policy changes, including the shift to “major impact cases.” Also, beginning in November 1991, the IFB and the Office of the Attorney General issued joint press releases when indictments and convictions were obtained.
The interchange of information may continue after the referral of a case from the IFB to the Office of the Attorney General. Moreover, IFB investigators may continue and have continued to be involved in and assist with an ongoing investigation,[22] see Commonwealth v. Sbordone, 424 Mass. 802, 811 (1997); this collaboration provides the Fraud Division with investigatory resources in addition to those provided by the state police.[23]
The degree of interaction between the IFB and the Fraud Division is evidenced by a matrix prepared by the chief of the Office of the Attorney General’s Business and Labor Protection Bureau, setting forth the respective responsibilities of the IFB and Fraud Division at all stages of a criminal prosecution. According to its creators, the matrix was designed to provide “flexible parameters” within which each agency should operate and to “enhance opportunities for cooperation and communication.”[24]
The Attorney General has characterized this relationship as “unique” and a “special private/public partnership,” and has told IFB board members he was “looking for concrete, measurable results and accountability” in the partnership. In its January 1995, IFB publication, the chairman of the IFB board of governors wrote that “the IFB was created to fulfill a specific need of pooling the combined resources of the insurance industry and state agencies including the [Office of the Attorney General]. The creation of the IFB was a unique attempt to synergize the cooperation of public and private entities.” Indeed, after an international conference of insurance fraud agencies, the vice president for research at the IFB commented that other attendees were “impressed” with the IFB’s “access to prosecutors.”
The Fraud Division prosecutes insurance fraud cases in both the Superior and District Courts of the Commonwealth. All recommendations to initiate an investigation and seek charges are submitted to the Fraud Division’s chief, who is also involved in the prosecution of this case. District Court prosecutions are subsequently reviewed by the chief of the Business and Labor Protection Bureau. Proposed Superior Court prosecutions are reviewed by the bureau chief and the First Assistant Attorney General. In some cases, other bureau chiefs and the Attorney General will review the case.
IV. THE FUNDING MECHANISM.
In order to make this unique synergy function, the AIB and WCRIB are assessed annually, according to the legislative financing scheme, to provide funding for the Fraud Division’s dedicated insurance fraud prosecutors.[25] The Massachusetts Executive Office of Consumer Affairs and Business Regulation sends a letter, typically in February, to the AIB and to the WCRIB, informing each of the amount of their statutory assessment.[26] Enclosed with the letter is an invoice for the “AGO Assessment,” to be remitted to the state Division of Insurance. On a quarterly basis, the AIB and WCRIB each issue a check, payable to the Commonwealth of Massachusetts. The checks are deposited into the Office of the Attorney General’s subaccount of the General Fund, and are specifically designated for the Fraud Division. The Office of the Attorney General subsequently uses those funds to pay the salary, fringe benefits and indirect costs of the Fraud Division assistant attorneys general.[27]
As the amount of the assessments against the AIB and WCRIB have grown, so have the number of Fraud Division assistant attorneys general. In FY 1991, the first year of the IFB, the Office of the Attorney General had one full-time dedicated insurance fraud prosecutor; by FY 1995, the number had increased to 18 assistant attorneys general, including 15 funded by the §11F funds. As of FY 1997, the total amount of money the AIB and WCRIB had provided to the Office of the Attorney General amounted to $2.78 million.
In addition, while the legislative scheme does not explicitly provide for the transfer of resources, monetary or otherwise, between the IFB and the Fraud Division, the IFB has nevertheless provided in-kind support to the Fraud Division by assisting with the investigation of cases assigned for prosecution. This assistance has consisted of obtaining documents, interviewing witnesses, serving subpoenas, providing charts and photographs, and arranging for handwriting and accident reconstruction experts. On occasion, IFB investigators have provided airline tickets or other travel reimbursement for out-of-state witnesses, and the IFB has given the Fraud Division computer software (the “Excel” spreadsheet program) to assist it in tracking cases. As specifically relates to this case, the IFB has reimbursed an assistant attorney general for his purchase of a “Seagate” hard drive, has provided blank computer back-up tapes and an extension cord to assist the Fraud Division in its investigation and search of the computer system at the defendant’s law firm, and has paid the bill of the computer expert who assisted in setting up the Ellis & Ellis computer system in preparation for the Commonwealth’s search.
V. THE HISTORY OF THIS CASE.
In June 1990, the director of human resources at Plastican, a Leominster manufacturing company, sent a letter to then Attorney General James Shannon. She was concerned by what she perceived as a trouble *682 some pattern: a number of Plastican’s employees were away from work for work-related injuries, many of them had invalid social security numbers, and nine of them were represented by the law firm of Ellis & Ellis.
In June 1991, the Plastican offices sent a second letter to the Office of the Attorney General. Like the letter to Attorney General Shannon, the 1991 letter to Attorney General Scott Harshbarger detailed what the director believed to be misleading and illegal actions by lawyers employed by Ellis & Ellis, who represented each of the suspected individuals. She wrote that Plastican had observed "clear patterns of fraud and deceit not experienced with other law firms” and that Ellis & Ellis attorneys were “notorious for their actions."
In January 1992, Roger Casavant, the owner of Country Home Furnishings Store in Gardner, Massachusetts, filed a complaint with the IFB. Casavant informed the IFB that an employee who had sought legal advice from Ellis & Ellis regarding a prior back injury had been encouraged to file false claims and was coached to lie about his injury and symptoms by an employee of Ellis & Ellis. Also in 1992, the Office of the Attorney General received a complaint from Tamor Plastics Company regarding suspicious claims filed by its employees. Ellis & Ellis represented all of those employees and all the disputes involved claims of concurrent employment. The IFB opened its file on Ellis & Ellis in November 1992.
In January 1993, a representative of the Department of Industrial Accidents filed a complaint with the IFB regarding suspicious claims of concurrent employment by individuals represented by Ellis & Ellis. According to the Commonwealth, it was at that time, in early 1993, that they decided to focus on the “common denominator”: Ellis & Ellis. The defendants dispute that assertion, claiming that they were purposefully targeted by the IFB from the outset. It cannot be refuted, however, that Plastican’s first letter to the Office of the Attorney General was six months before the IFB was even created.
As a result of the investigation conducted by the IFB and the Office of the Attorney General into the activities of Ellis & Ellis, three search warrants were obtained on May 1, 1996, from the Superior Court (Kottmyer, J.) for the law offices of Ellis & Ellis at 16 Norwich Street and 44 Front Street in Worcester, and for the firm’s storage facility at 3 Chestnut Street. The warrants were executed the next day, as was a warrant for defendant James Economou’s residence at 91 Kalmar Street, Worcester.
On December 27, 1996, a Worcester County Special Grand Jury was convened. Over a span of nine months, the grand jury heard 30 days of testimony, consisting primarily of testimony from IFB investigators. The Fraud Division assistant attorneys general presented the case and signed the indictments. On March 18, 1997, 82 indictments against seven defendants were returned (the so-called “Round I” indictments). On September 12, 1997, 143 indictments were returned against 14 defendants (the so-called “Round II” indictments), some of whom had been indicted previously in Round I.[28] The indictments allege numerous counts of workers’ compensation fraud as well as larceny over $250.00, conspiracy to commit insurance fraud, illegal loans, motor vehicle insurance fraud, tax evasion, and one count of influencing a witness.[29] Those charged include the name partners of Ellis & Ellis, as well as their employees, clients, and medical consultants. The defendant’s motion to dismiss now before the Court was filed November 5, 1997.
DISCUSSION
I. DEFENDANT’S REQUEST FOR AN EVIDENTIARY HEARING.
The defendant argues that he is entitled to an evidentiary hearing at which he can prove “the extent to which the prosecutors are encumbered by private interests and private influence.” For the reasons set forth below, that request will be denied.
First, neither the parties nor this Court have uncovered Massachusetts cases which squarely address the issue of whether a defendant is entitled to an evidentiary hearing on a pre-trial motion to dismiss or disqualify based on the argument that the prosecution is the result of impermissible and perhaps unconstitutional influence brought to bear by private interests. In related situations, whether an evidentiary hearing is required is discretionary. See Commonwealth v. Shagoury, 6 Mass.App.Ct. 584, 593 (1978), cert. denied, 440 U.S. 962 (1979) (citation omitted) (“judge acted within his discretion in deciding the [post-trial] motion for a new trial [based on the interested prosecutor theory] solely upon the affidavits”). See also Commonwealth v. Black, 403 Mass. 675, 678 (1989), citing Commonwealth v. Brandano, 359 Mass. 332, 337 (1971) (pre-trial motion to dismiss an indictment because of insufficient evidence decided on affidavits and memoranda of law; a hearing should be held on any disputed matter): Commonwealth v. Wysocki, 28 Mass.App.Ct. 45, 48-49 (1989) (judge may be able to resolve disputed questions of fact regarding speedy trial on affidavits alone, but case remanded for evidentiary hearing limited to credibility of affiant).[30]
Second, in those circumstances in which defendants have attempted to gain access to sensitive matters,[31] courts have required the movant to meet a threshold burden of proof before allowing such access. See, e.g., Commonwealth v. Coyne, 372 Mass. 599, 601 (1977) (judge could require “a more substantial factual predicate” than “impressionistic and conclusory assertions” to support defendant’s request for discovery of administrative details of the District Attorney’s office): Commonwealth v. Wants, 426 Mass. 639, 644 (1998) (“a defendant may not obtain information in the possession of an internal affairs division . . . without making a showing to a judge . . . that there is a *683 specific, good faith reason for believing that the information is relevant to a material issue in the criminal proceedings and could be of real benefit to the defense”).
By analogy to these standards, this Court determines that, in this case, the defendant must make a colorable, threshold showing that material facts remain in genuine doubt or dispute, see United States v. Lilly, 983 F.2d 300, 310 (1st Cir. 1992), post-conviction relief denied, 901 F.Supp. 25 (D.Mass. 1995), aff'd, 80 F.3d 24 (1st Cir. 1996) (citations omitted), or that there is a real issue with respect to the credibility of a witness who has testified in this matter by way of affidavit, see Wysocki, 28 Mass.App.Ct. at 48-49; and, that an evidentiary hearing would uncover specific, relevant evidence on either issue that would advance his claim. The Court heard oral argument on this motion,[32] has reviewed all of the memoranda, affidavits and documents submitted by each party, and is satisfied that an evidentiary hearing is neither necessary nor required to resolve the matter. For purposes of deciding this motion, the Court accepts all the defendant’s subsidiary facts as true, see United States v. Terry, 806 F.Supp. 490, 497 (S.D.N.Y. 1992), including the presence of the Office of the Attorney General’s representatives at IFB meetings, the level of involvement of IFB investigators after referral, the IFB’s provision of in-kind resources to the Fraud Division, the amount of money flowing indirectly from the AIB and WCRIB to the Office of the Attorney General byway of the legislative construct, and the Fraud Division’s failure to prosecute an insurance company for fraud. None of these facts remain in doubt or dispute, nor are there any additional facts that are material to the resolution of this motion.
Moreover, in the context of all of the memoranda, affidavits and documents, this Court finds no substantial, real issue with respect to the credibility of the witnesses which would affect this Court’s ultimate conclusion. The only arguably inconsistent fact turns on the issue of how intimately involved the IFB investigators are with cases of suspected fraud after those cases are referred to the Fraud Division; however, even if the facts were taken in the light least favorable to the Commonwealth, this Court cannot conclude that this distinction amounts to anything more than semantics.[33]
As will be described in Part II of this Memorandum, this Court is of the opinion that the Fraud Division of the Office of the Attorney General is not impermissibly encumbered by private influence, nor that that conclusion reasonably follows from the undisputed subsidiary facts found by the Court. Accordingly, the defendant’s request for an evidentiary hearing will be denied.
II. DEFENDANT’S MOTION ON THE MERITS.
In support of his motion to dismiss, the defendant argues that St. 1990, c. 338 and its progeny has created a particular relationship between the insurance industry and the Office of the Attorney General; that that relationship, based on a financial as well as an operational symbiosis, infects prosecutorial decisions of the Office of the Attorney General to the extent that such decisions are not made on an impartial and objective basis; that the biased decision to prosecute him and his co-defendants in this case for alleged acts of insurance fraud has deprived him and his co-defendants of certain constitutional and statutory protections against unfair and prejudicial enforcement of the laws of this Commonwealth; and that, for that reason, the indictments in this case should be dismissed. Specifically, the defendant has argued that, in this case, the initiation of a criminal investigation and the subsequent prosecution of charges against him and his co-defendants violate the Due Process Clause of the Fourteenth Amendment; Articles 5, 6, 7, and 12 of the Massachusetts Declaration of Rights; G.L.c. 12, §30; and the policy of the Commonwealth proscribing discriminatory action on the part of a public prosecutor. Each of those arguments will be addressed seriatim.
A. As Applied in This Case, the Financing Scheme Established by the General Court by Way of St. 1990, c. 338 and its Progeny Does Not Violate the Defendant’s Due Process Rights to a Fair Trial Conducted by a Disinterested Prosecutor as Protected by Article 12 of the Massachusetts Declaration of Rights or the Fourteenth Amendment to the Constitution of the United States.
1. The Standard of Review.
In mounting his “as applied” attack to the legislative scheme, the defendant bears a heavy burden to show that the scheme is unconstitutional. “As a general principle, all rational presumptions are made in favor of the validity of every act of the legislative department of government, and the court will not refuse to enforce it unless its conflict with the Constitution is established beyond a reasonable doubt.” Brookline v. Secretary of the Commonwealth, 417 Mass. 406, 420 (1994) (citations omitted). See also Neff v. Commissioner of the Dep’tof Indus. Accidents, 421 Mass. 70, 73 (1995), quoting Commonwealth v. Lammi, 386 Mass. 299, 301 (1982) (court “indulge(s) every rational presumption in favor of the statute’s constitutionality”); Leibovich v. Antonellis, 410 Mass. 568, 576 (1991) (citations omitted) (the defendant must demonstrate beyond a reasonable doubt that there are no “conceivable grounds” which could support the statute’s validity).
Article 12 of the Massachusetts Declaration of Rights and the Fourteenth Amendment to the United States Constitution each provide citizens with the protection of due process of law. Where applicable, Article 12 provides that “. . . no subject shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, or privileges, put out of the *684 protection of the law, exiled, or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land.” Where relevant, the Fourteenth Amendment provides that “[no] State [shall] deprive any person of life, liberty, or property, without due process of law." These guarantees have oftentimes been interpreted to provide comparable protections. See, e.g., Commonwealth v. Brown, 426 Mass. 475, 482 (1998), quoting Trigones v. Attorney General, 420 Mass. 859, 864 (1995) (“for the purpose of due process analysis, our standard of review under the cognate provisions of the Massachusetts Declaration of Rights usually is comparable to that under the Fourteenth Amendment to the United States Constitution”). See also Doe v. Attorney General, 426 Mass. 136, 144 n.8 (1997) (citation omitted) (“we treat the procedural due process protections of the Massachusetts and United States Constitutions identically”).
At the outset, it is not explicitly clear whether, in this case, the defendant is asserting a procedural or substantive due process right — or both — to an impartial prosecutor.[34] It appears to this Court, however, that the defendant’s asserted right to a disinterested prosecutor is grounded in substantive due process. The Court reaches this conclusion on the understanding that the defendant’s procedural due process rights to confront and cross-examine witnesses, to offer testimony, and to be represented by counsel (all recognized, essential rights to a fair criminal trial under the Due Process clause, see Chambers v. Mississippi, 410 U.S. 284, 294 (1973)) are not affected by the purported unconstitutionalily of the financing scheme. The defendant will receive the procedural process to which he is due, and he makes no claim to the contrary. See Pittsley v. Warish, 927 F.2d 3, 6 (1st Cir.), cert. denied, 502 U.S. 879 (1991) (where defendant challenges the state’s conduct as inadequate, rather than the adequacy of the procedure, due process claims examined under rubric of substantive due process).
The distinction is an important one, for it governs the analysis which this Court must apply. “So-called ‘substantive due process’ prevents the government from engaging in conduct that ‘shocks the conscience,’ or interferes with rights ‘implicit in the concept of ordered liberty.’ ” Aime v. Commonwealth, 414 Mass. 667, 673 (1993) (internal citations omitted), quoting United States v. Salerno, 481 U.S. 739, 746 (1987).[35] The defendant does not distinguish between these two “alternative tests,” Pittsley, 927 F.2d at 6; however, his claim appears to be more solidly grounded in the second theory of substantive due process, and this Court’s analysis will proceed with that understanding.[36]
To sustain a claim under the theory that the legislation at issue interferes with rights "implicit in the concept of ordered liberty,” see Aime, 414 Mass. at 673, quoting Palko v. Connecticut, 302 U.S. 319, 325-26 (1937), the defendant must first demonstrate the existence of a right or interest which he claims is protected by the Fourteenth Amendment and which may arguably be threatened by the relationship between the Fraud Division and the IFB. See Pittsley, 927 F.2d at 7. See also Brown v. Hot, Sexy and Safer Prod., Inc., 68 F.3d 525, 531, 532 (1st Cir. 1995), cert. denied, 516 U.S. 1159 (1996). Here, the defendant clearly has a recognized, fundamental, substantive right not to be deprived of his liberty absent a fair trial, conducted by an impartial, disinterested prosecutor. People v. Superior Ct. of Contra Costa County, 561 P.2d 1164, 1171 (Cal. 1977); State of New Jersey v. Imperiale, 773 F.Supp. 747, 750 (D.N.J. 1991), citing Ganger v. Payton, 379 F.2d 709, 714 (4th Cir. 1967). See also Strickland v. Washington, 466 U.S. 668, 684-85 (1984).
The next question, therefore, is whether that fundamental substantive right to a fair trial conducted by a disinterested prosecutor has been compromised by the legislation at issue here. If the defendant’s fundamental substantive right to a fair trial is compromised by the legislation at issue, that infringement “may be justified only by a ‘compelling state interest’ and [the legislation] must be narrowly drawn to express only the legitimate state interests at stake.” Roe v. Wade, 410 U.S. 113, 155 (1973) (citations omitted). See also Aime, 414 Mass. at 673 (citation omitted) (challenged legislation affecting a fundamental right must be “narrowly tailored to further a legitimate and compelling governmental interest”).
2. In This Case, the Defendant Has Not Been Deprived of His Fundamental Right to a Disinterested Prosecutor.
The Fraud Division, as prosecutor, “need not be disinterested on the issue whether a prospective defendant has committed the crime with which he is charged,” People v. Eubanks, 927 P.2d 310, 316 (Cal. 1996), quoting Wright v. United States, 732 F.2d 1048, 1056 (2nd Cir. 1984), cert. denied, 469 U.S. 1106 (1985); however, “both the accused and the public have a legitimate expectation that [the prosecutor’s] zeal, as reflected in his tactics at trial, will be bom of objective and impartial consideration of each individué case.” Superior Ct. of Contra Costa County, 561 P.2d at 1172. This proscription against an interested prosecutor “helps to guarantee that life, liberty or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law. At the same time, it preserves both the appearance and reality of fairness, ‘generating the feeling, so important to a popular government, that justice has been done.’ ” Marshall v. Jerrico, Inc., 446 U.S. 238, 242 (citations omitted).
To ensure that a criminal defendant’s trial is fair, a judge may exercise his discretion and disqualify a prosecuting attorney “when the judge determines that the attorney suffers from a conflict of interest which might prejudice him against the accused and thereby *685 affect, or appear to affect, his ability to impartially perform the discretionary functions of his office.” Superior Ct. of Contra Costa County, 561 P.2d at 1173 (emphasis supplied). No actual prejudice need be shown: “a reasonable potential for prejudice will suffice.” Wright, 732 F.2d at 1056 (citations omitted). See also Young v. U.S. ex rel. Vuitton et Fils S.A., 481 U.S. 787, 811 (1986) (“a concern for actual prejudice in such circumstances misses the point, for what is at stake is the public perception of the integrity of our criminal justice system”).
The situation sub judicata, however, is distinguishable from the paradigm of disinterested prosecutor cases. In most such cases, the issue regarding prosecutorial impartiality arises when an individual, rather than the sovereign, is prosecuting another individual. See, e.g., State v. Storm, 661 A.2d 790, 794 (N.J. 1995) (state statute allowed a private attorney to prosecute his civil client’s criminal stalking and harassment complaint where the parties had a lengthy history of acrimonious litigation): Ganger, 379 F.2d at 711 (state prosecuting attorney represented defendant’s wife in a pending divorce action based upon the same assault): Imperiale, 773 F.Supp. at 749 (individual prosecuted his coworker for simple assault after municipal prosecutor declined case); Young, 481 U.S. at 791 (attorney for private party beneficiary of criminal contempt action appointed to prosecute violation of injunction barring further trademark infringement). In this case, the putative interest stems from the industry-financed insurance fraud investigation system, rather than a direct, individual conflict.
The defendant relies heavily on People v. Eubanks, 927 P.2d 310 (Cal. 1996), a case in which the defendants sought to disqualify the district attorney based on the fact that the corporate victim had directly reimbursed the district attorney’s office for the costs of its investigation. In that case, the Supreme Court of California addressed in dicta the distinction between individual and institutional conflicts arising from private financing of public prosecutions. First, the Eu-banks court observed that “industry-financed funding schemes for certain types of fraud prosecutions” differ from those situations where a victim directly contributes financially to the costs of the district attorney’s investigation. Id. at 321. Second, the court conceded that, standing alone, the fact that arguably suspect financing is directed to an institution rather than an individual does not mean that influence is impossible, Id. at 319-20, but found that such a relationship renders improper influence more remote and unlikely. Id. at 321. Third, in reaching its determination that improper influence was more remote and unlikely, the court in Eubanks considered such factors as the funding being required by law, the assessments being made industry-wide, not just against one particular victim, and the use of the assessed funding for the “investigation and prosecution of automobile and workers’ compensation insurance fraud generally, rather than for the particular benefit of any one victim.” Id. According to the Eubanks court, “[t]hese factors tend to reduce the likelihood any victim would gain, through financial contributions, influence over the conduct of any particular prosecution.” Id. On the facts of the case before it, the Eubanks court ultimately held that the motion to disqualify should have been allowed due to the gravity of the conflict, based in part upon the size of the monetary donation which the victim directly gave the district attorney’s office.
In the present case, the defendant’s argument that a conflict of interest inures in the context of the Eubanks analysis is incorrect. In the first instance, the AIB and WCRIB have no choice regarding their funding of either the IFB or the Fraud Division. The legislative scheme mandates that funding, irrespective of whether the cases referred by the AIB’s and WCRIB’s members to the IFB, and subsequently to the Fraud Division, are accepted for prosecution. Even if all such cases were declined for prosecution, the AIB and WCRIB would still be required to contribute to the costs of the IFB and the expenses of the Fraud Division.[37] Thus, the defendant’s argument that it is the AIB and WCRIB, and concomitantly their insurance company members, which control the Fraud Division’s purse strings and, therefore, the Fraud Division’s prosecutorial policymaking, is not borne out by the facts.
Second, the Fraud Division receives no benefit, financial or otherwise, from its prosecutions. Under the legislative scheme, restitution is paid to the insurance company, not the Fraud Division, following a conviction. The defendant does raise the specter of a financial boon to the Fraud Division based upon prosecutorial results by highlighting the AIB’s 1993 decision to “double” the amount given to the Fraud Division. As pointed out supra at note 26, however, that figure seems to have been calculated in error. In any event, even if the AIB did funnel $400,000 extra into the General Fund for the Fraud Division’s dedicated insurance fraud prosecutors, it does not change the equation. The defendant makes no connection between a particular prosecutorial decision and the Fraud Division’s receipt of that $400,000 via the General Fund.
Moreover, aside from the defendant’s speculation and conjecture that such influence could be uncovered by way of an evidentiary hearing, there has been no evidence demonstrating that individual insurance companies, the AIB, the WCRIB, or the IFB have any controlling influence over the Fraud Division’s discretionary prosecutorial decisions. As the record in this case indicates, the Fraud Division remains in control of this prosecution, despite the in-kind assistance rendered it by the IFB and the funding provided by the AIB and WCRIB. See generally Person v. Miller, 854 F.2d 656, 664 (4th Cir. 1988), cert. denied, 489 U.S. *686 1011 (1989) (court ‘‘must assume, both because of the general presumption of regularity that attaches to official conduct and because there is no disproof in the record” that United States Attorney was in control of prosecution).
Third, even if the IFB, AIB or WCRIB were able to exercise some level of influence over which cases the Fraud Division staff lawyers decided to prosecute, all of those decisions are reviewed by other assistant attorneys general who are outside of the Fraud Division, including at times the First Assistant Attorney General and the Attorney General himself. These layers of review act as a further screening mechanism which Alters out the interest an individual insurance company or the IFB may have in the prosecution of any particular case. Moreover, no individual Fraud Division attorney would receive any pecuniary benefit for prosecuting a certain case. The defendant does not dispute the Commonwealth’s assertion that the salaries of the Fraud Division assistant attorneys general are set within the Office of the Attorney General without input from any outside entities, as are the salaries of every assistant attorney general. As such, they are unaffected by the results of particular prosecutions. Nor does the defendant contend that the Fraud Division assistant attorneys general involved in this case have received any bonuses, monetary or otherwise, from the insurance companies at issue.[38]
Fourth, if the Fraud Division were to prosecute an insurance company for insurance fraud,[39] the AIB, WCRIB and IFB have no recourse, other than to shift more of their referrals to the District Attorney and the United States Attorney. The AIB and WCRIB are legislatively mandated to continue funding the Fraud Division. And, regardless of which insurance fraud cases the Fraud Division prosecutes, and regardless of who the victim is in those cases, the Fraud Division assistant attorneys general still receive their salaty from the General Fund.
In sum, the defendant cannot establish that the Fraud Division is serving two masters, even if the underlying facts are construed as he would have them. As are all sovereign prosecutors, the Fraud Division assistant attorneys general are accorded a “presumption of impartiality.” United States v. Terry, 17 F.3d 575, 577 (2nd Cir.), cert. denied, 513 U.S. 946 (1994). The defendant has not overcome that presumption. Accordingly, this Court rules that the legislative scheme at issue does not violate the defendant’s fundamental, substantive right to a fair trial conducted by an impartial, disinterested prosecutor.
3. Even if the Defendant’s Fundamental Right to a Fair Trial Conducted by an Impartial, Disinterested Prosecutor Had Been Infringed Upon, the Legislative Scheme Would Pass Muster Under Strict Scrutiny Review.
Absent any infringement upon the defendant’s fundamental right to a disinterested prosecutor, the Court need not resolve the issue of whether the legislative scheme withstands strict scrutiny review. See Brown, 68 F.3d at 532 (action which infringes upon a fundamental right upheld only if it passes muster under strict scrutiny); Commonwealth v. O’Neal, 369 Mass. 242, 245 (1975) (citations omitted) (“a statute affecting fundamental rights must be shown to serve a compelling governmental interest”) (emphasis supplied). Even assuming, however, for purposes of this decision, that the defendant’s fundamental right to a disinterested prosecutor has been limited by the legislative scheme at issue, it is this Court’s opinion that the legislation would survive.
The government has a legitimate and compelling interest in prosecuting insurance fraud while conserving scarce public resources. See International Bus. Machines Corp. v. Brown, 857 F.Supp. 1384, 1389 (C.D.Cal. 1994) (interests of society “irrefutably served” if criminals “brought to justice with a minimum diversion of public resources”); Merin v. Maglaki, 599 A.2d 1256, 1264 (N.J. 1992) (state “incurs a significant financial burden” investigating and prosecuting insurance fraud). See generally Longval v. Workers’ Comp. Appeals Bd., 59 Cal.Rptr.2d 463, 468, 51 Cal.App.4th 792, 801 (Cal.App. 4 Dist. 1996) (prevention of workers’ compensation fraud will reduce costs, "assist in restoring confidence and faith in the workers’ compensation system,” and “facilitate expedient and full compensation for employees injured at the workplace”); Fremont Comp. Ins. v. Superior Court, 52 Cal.Rptr.2d 211, 217, 44 Cal.App.4th 867, 877 (Cal.App. 4 Dist. 1996) (costs of insurance fraud crime are “indirectly borne by all consumers, employees and businesses”). The fiscal necessity of this type of arrangement, where private industry provides financing to law enforcement, has become apparent in the recent past. See International Bus. Machines Corp., 857 F.Supp. at 1388-89 (rampant crime and severely strained law enforcement resources support allowing corporate victims to share the financial burden of investigating and prosecuting business fraud).
The legislation at issue in this case is narrowly tailored to further that interest. The AIB and WCRIB, both legislatively-created entities, are the conduit for the insurance industry’s indirect financing of the IFB and the Fraud Division. Designated funds for the Fraud Division are channeled through the General Fund and are used to pay the salaries of the Fraud Division assistant attorneys general. In this case, there is no suggestion that individual insurance companies pay attorneys in the Fraud Division directly. Further, the legislature gave neither the AIB, WCRIB, or any individual insurance company any access to the Fraud Division’s prosecutorial decision-making. This legislative distancing between the insurance companies and the Fraud Division is further protected by the layers of review the Office of the Attorney General employs on each decision to prosecute. While some may question the wisdom of St. 1990, c. 338 and its *687 progeny as a matter of public policy, it is the opinion of this Court that the legislation in this case, if reviewed in the context of a strict scrutiny analysis, would survive a constitutional challenge.
B. G.L.c. 12, §30 and Commonwealth v. Tabor do not apply to the situation sub judicata.
The defendant also argues that G.L.c. 12, §30 requires the disqualification of the Fraud Division attorneys. Where relevant, G.L.c. 12, §30 (West 1996 ed.) provides:
No prosecuting officer shall receive any fee or reward from or in behalf of a prosecutor for services in any prosecution or business to which it is his official duty to attend, nor shall he be concerned as counsel or attorney for either party in a civil action depending upon the same facts involved in such prosecution or business.
General Laws c. 12, §30 has been interpreted to require that “in criminal proceedings, neither the public prosecutor nor any attorney assisting him [may] receive compensation from any private party. ‘In such cases the statute supposes that the prosecution will be conducted by the law officers, for their salaries, and without any other compensation whatever.’ " Commonwealth v. Tabor, 376 Mass. 811, 818 (1978), quoting Commonwealth v. Knapp, 27 Mass. (10 Pick.) 477, 481-82 (1830). The common law also “express[es] the policy of this Commonwealth that the office of the district attorney is to be administered ‘wholly in the interests of the people at large and with an eye single to their welfare.’ ” Tabor, 376 Mass. at 818 (citations omitted).
The defendant’s specific argument here is that the insurance industry essentially “underwrites” the Fraud Division, injecting impermissible private interest and influence into the prosecutorial decisions and thereby violating G.L.c. 12, §30 and the policy expressed in Tabor. While at first glance it may be troubling that the salaries of the assistant attorneys general and other expenses of insurance fraud prosecutions conducted by the Fraud Division are paid for in part, however indirectly, by insurance industry associations, a review of the plain language of G.L.c. 12, §30 and G.L.c. 12, §4A, as well as a comparison to assessments against other industries used to fund other divisions within the Office of the Attorney General, reveals that the financial arrangement is not as unusual or detrimental as the defendant would have us believe.
By the plain language of its terms, G.L.c. 12, §30 prohibits a prosecutor from personally profiting or gaining in exchange for prosecuting cases, and prohibits a prosecutor from acting as private counsel to an interested party. “It is inconsistent with the public interest and welfare for any law enforcement officer directly or indirectly to represent any person involved in a criminal matter, except the State, or receive any personal profit or gain as a result of the arrest, conviction or acquittal of one charged with the infraction of the law or in connection with the filing of any such charge.” Sinclair v. State, 363 A.2d 468, 476 (Md. 1976) (prosecutors were interested in the outcome of a trial where they represented parties holding notes against the defendants). See also Tabor, 376 Mass. at 815 (prosecutor represented victim’s widow in an action for compensation trader G.L.c. 258A); Shagoury, 6 Mass.App.Ct. at 591 (prosecutor offered employment by corporate victim during criminal trial).
Clearly, those situations are distinguishable from the one in the present case. The Office of the Attorney General represents the interests of the citizens of the Commonwealth, not just the interests of a particular victim, in every criminal prosecution. Manning v. Municipal Court of Roxbury Dist., 372 Mass. 315, 317 (1977) (prosecution of any complaint is “conducted in the interests of the Commonwealth and not on behalf of the alleged victim”). Likewise, the Fraud Division assistant attorneys general represent the Commonwealth in cases where insurance companies are victimized by fraudulent claims. The Fraud Division attorneys are not representing the insurance companies in civil actions to recover their loss; they are prosecuting, on behalf of the citizens of the Commonwealth, those who alleged to have defrauded insurance companies.[40]
Neither do the Fraud Division assistant attorneys general receive any compensation aside from their salary for prosecuting insurance fraud. The attorneys in the Fraud Division receive no financial reward from the insurance industry nor from any insurance company in response to a particular result achieved. The Fraud Division assistant attorneys generals’ salaries and benefits, while indirectly paid for by insurance industry associations through the legislatively mandated scheme described above, are not affected by the number or result of insurance fraud prosecutions, but are set by the Office of the Attorney General, without any input from either the IFB, AIB or WCRIB.[41]
Further, other departments within the Office of the Attorney General receive funding from private sources, and these arrangements have been similarly established by the General Court.[42] In recognition of these arrangements, the General Court enacted G.L.c. 12, §4A, effective July 1, 1991, which provides that “the [Office of the Attorney General] may accept any gifts or grants of money or property, whether real or personal, from any source, whether public or private, including but not limited to the United States of America or its agencies, for the purpose of assisting the department in the discharge of its duties.” G.L.c. 12, §4A (West 1996 ed.). While no reported cases have interpreted this statute, its meaning is clear: the Office of the Attorney General can accept money, including money from private sources, to enable it to perform its duties. Section 4A thus explicitly allows for the legislative funding mechanism at work here.
Accordingly, the defendant’s argument that the legislative scheme requiring the AIB and WCRIB to *688 provide financial resources to the Office of the Attorney General violates G.L.c. 12, §30 and the policy enunciated in Commonwealth v. Tabor, supra, fails.[43]
C. The Funding Mechanism Does Not Violate Articles 5, 6, or 7 of the Massachusetts Declaration of Rights.
The defendant’s argument that articles 5,[44] 6,[45] and 7[46] of the Massachusetts Declaration of Rights require a disinterested prosecutor can be summarily dismissed, as they are brief (two paragraphs) and unsupported. An abbreviated, superficial challenge based on state constitutional provisions need not be addressed by the court. See Belhumeur v. Labor Relations Cornm’n, 411 Mass. 142, 147-48 (1991), cert. denied, 503 U.S. 1004 (1992) [47]
CONCLUSION
This Court is not unconcerned about the potential conflict suggested by the financing scheme at issue in this case. It has fostered a somewhat unusual level of intimacy between the Fraud Division, a prosecutorial agency charged with protecting the public interest, and the IFB, a private agency operating on the resources of the insurance industry. As a matter of public policy, such a relationship may not seem particularly desirable. Disconcerting though it may be, however, it is not for this Court to question the wisdom of the legislative policy on which the enactment of this scheme was predicated. See Guzman v. MRM/Elgin; Wilcox & Gibbs, Inc., 409 Mass. 563, 570 (1991) (the legislature is better equipped than the courts to resolve issues of broad public policy involving balancing of interests). It is for this Court, rather, to evaluate that legislative enactment in the context of competing and sometimes conflicting constitutional protections. In the present case, it is the opinion of this Court that the legislation at issue, and the relationship is has created, does not violate the constitutional, statutory or common law rights of the defendant to a fair and impartial prosecutorial process. For that reason, the defendant’s motion to dismiss the indictments or to disqualify prosecuting counsel will be denied.[48]
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendant’s Motion to Dismiss, to Disqualify Prosecuting Counsel, and for Other Appropriate Relief is DENIED.

 All of the above-named defendants have joined the instant motion. At the hearing on the motion to dismiss, however, only counsel for James N. Ellis, Sr., James N. Ellis, Jr., and Ronald D’Auteil argued before the Court.

 Neither this act, nor any of the subsequent amendments, have been codified in the General Laws.

 According to the 1990 act’s sunset provision, it would terminate on December 31, 1993. St. 1990, c. 338, §2. Presumably, the intent of the legislature in including such a provision was to create a set period of time within which the IFB could prove its utility. The most recent incarnation of the act contains no such provision.

 As of January 1998, 235 Massachusetts insurance companies were AIB members.

 Over the first seven years of the IFB’s life, the AIB had provided almost $12.7 million for its operation.

 The WCRIB provided the IFB with over $11.3 million between FY 1992 and FY 1997.

 As of December 1997, 284 of the 307 workers’ compensation carriers licensed in Massachusetts were members of the WCRIB.

 Now known as the Department of Transitional Assistance.

 An insurance fraud unit was formed within the Office of the Attorney General in 1992; the Insurance Fraud Division, within the Business and Labor Protection Bureau of the Office of the Attorney General, was created in 1995.

 Absent legislative history explaining the reason for this difference, the Court can only speculate as to why the legislature chose to assess one group more than the other.

 To clarify, insurance companies do not pay the Fraud Division directly. All monies paid to the Fraud Division arrive into the General Fund via the assessments the AIB and WCRIB levy against their members.

 This includes one IFB investigator, John Sargent, who had investigated the defendant while employed at The Travelers Insurance Company’s special investigative unit, before he joined the IFB.

 Both the 1990 and 1991 legislation used the term “shall,” connoting the mandatory nature of the insurers’ obligation. Indeed, insurance companies have been denied rate increases due in part to their failure to “utilize fully” the IFB. See Automobile Insurers Bureau of Massachusetts, 415 Mass. at 462.

 Although this same phrase was used in the 1990 legislation, it was not until the 1991 amendments, one year after the IFB was established, that the term “fraudulent insurance transactions” was defined to include, but not be limited to, fraud and abuse of the system by attorneys, insurers, employers, medical providers, vocational rehabilitation providers, agents for attorneys or other service providers, claimants, or other individuals or companies alleged to have engaged in unlawful acts under the provisions of [G.L.c. 152, §14, G.L.c. 266, §§111A or 11 IB] or other laws of the commonwealth concerning insurance fraud. St. 1991, c. 398, §99, subsection (l)(f).

 The legislative scheme does not grant the IFB subpoena power. However, if a “person neglects or refuses to comply with any request to provide testimony or produce books and records relevant to the investigation, the executive director may refer the matter to the attorney general, the district attorney, or the United States attorney.” St. 1991, c. 398, §99, subsection 1(h).

 Seven percent of the total (960 reports) were from other sources; 46% of these were accepted for investigation by the IFB.

 The IFB must also refer any suspected violations to “the appropriate licensing agencies of the state and federal governments.” St. 1991, c. 398, §99, subsection l(i).

 The remaining cases were referred to other agencies and out-of-state law enforcement.

 Thus, the defendant’s characterization of the IFB’s frustration with the “prosecutorial bottleneck” as a threat to “take its referrals elsewhere’’ proves too much. The IFB can, and does, utilize the spectrum of prosecutorial resources provided by its enabling legislation.

 The defendant contends that the IFB “supplies” investigators to the Fraud Division; the Commonwealth disputes that characterization, stating that IFB investigators remain under the supervision of the IFB. In either case, it is not disputed that IFB investigators “[customarily provide] ongoing investigatory support for the Attorney General’s subsequent inquiry.” Commonwealth v. Sbordone, 424 Mass. 802, 804 n.3 (1997).
The defendant also asserts that the Fraud Division and IFB have an “on-line computer link,” an assertion the Commonwealth denies. However, during the October 1995, IFB board meeting, the chief of the Office of the Attorney General’s Business and Labor Protection Bureau commented on the improved communication between the IFB and Fraud Division, “demonstrated by the exchange of prosecution related information via computer." Even if such a computer link existed, however, it does not demonstrate that the IFB exerts any influence over the prosecutorial decision-making of the Office of the Attorney General.

 Furthermore, IFB investigators have expertise in investigating insurance fraud which may not be possessed by the ordinary state trooper. See Sbordone, 424 Mass. at 804 (state police assigned to IFB investigation “were not extensively trained in investigating insurance fraud, they did not have [the IFB investigator’s] proficiency for identifying the types of insurance documents used to commit fraud, and they did not share his extensive knowledge of the aliases and the use of false social securiiy numbers, the dates of claims and losses, and the modus operandi of this particular fraud ring”).

 The defendant points to this matrix as evidence of the improper integration of the IFB and Fraud Division. The Commonwealth responds with samples of matrices created for the other divisions within the Office of the Attorney General’s Business and Labor Protection Bureau. According to the Commonwealth, the matrix is nothing more than a management tool. Even if the matrix is more than a mere management tool, however, it is not incriminating. It does not (defendant’s contentions notwithstanding) show that the IFB has any influence over the Fraud Division’s prosecutorial decisions.

 Thus, pursuant to the legislative scheme, the AIB and WCRIB are assessed twice: for the operating costs of the IFB and for the funding of the Fraud Division.

 In addition to this mandated amount, according to the June 1994, Auto Insurance Report, the AIB in June 1993, voluntarily increased the amount of funding it provided for the Fraud Division. The Report wrote that insurers were reportedly “so pleased ... with the results that... they voted to double the amount given the attorney general ... to $400,000 annually.” This figure seems to be in error, considering that in 1993 and 1994 the AIB was assessed $100,000 for the Fraud Division.

 From FY 1994 forward, the Fraud Division was also authorized by St. 1993, c. 110, §2 (the line-item budget for FY 1994) to supplement its fiscal resources by appropriating money in the General Fund which had been collected for the protection of consumers. General Laws c. 12, §1 IF authorizes the Office of the Attorney General, typically the assistant attorneys general within the Regulated Industries Division, to intervene on behalf of consumers in litigation regarding the rates and premiums charged by insurance companies. To fund these interventions, G.L.c. 26, §8F authorizes the Commissioner of Insurance to require insurance companies to levy an assessment against individual insurance policies. These assessments are pooled together to equal, in 1998, at least $1.15 million plus the costs of the salary and fringe benefits of the assistant attorneys general within the Regulated Industries Division. In FY 1994, the first year the Fraud Division was authorized to utilize the fund, the amount was $1.17 million.
Thus, funds assessed against individual policy holders for litigation against insurance companies may be being used by the Fraud Division to prosecute individuals accused of insurance fraud. It is not clear from the record, however, whether this transfer of funds reduced the amount available to the Regulated Industries Division for these interventions on behalf of consumers.

 On June 12, 1998, during the time this motion was under advisement, a third round of indictments was returned (the so-called “Round III” indictments). The 57 new indictments include additional charges against the defendant and Nicholas Ellis, and add three new defendants: Michael Bryan, Jay Rosenfield, and Mario Moretti. This memorandum does not apply to these new defendants and indictments.

 The purpose of this motion to dismiss is not to challenge the sufficiency of evidence pertaining to these indictments. The defendants have agreed to file McCarthy and O’Dell motions closer to trial.

 Evidentiary hearings on pre-trial motions are discretionary in federal court as well. In a case involving a claim of prosecutorial conflict of interest, the Court of Appeals for the First Circuit determined that, for both pre-trial and post-trial motions, “[flederal courts are not obliged to provide evidentiary hearings on demand. . . . [T]he movant must make an adequate threshold showing that material facts are in genuine doubt or dispute.” United States v. Lilly, 983 F.2d 300, 310 (1st Cir. 1992), post-conviction relief denied, 901 F.Supp. 25 (D.Mass. 1995), aff'd, 80 F.3d 24 (1st Cir. 1996) (citations omitted) (district court judge acted within his discretion in deciding the defendant’s motion for a new trial based upon the prosecutor’s conflict of interest by hearing oral argument, viewing exhibits and accepting counsel's representations as stated on the record).

 Here, the defendant would be probing the Office of the Attorney General’s prosecutorial policies and the Attorney General’s decision-making process, sensitive issues normally beyond the ken of standard discovery.

 In fact, there has been more than one hearing on this motion, and each co-defendant was provided an opportunity to address the Court.

 The defendant provided the Court with a recent affidavit submitted by the Commonwealth in a civil case against this defendant arising out of the same alleged acts of fraud. Westford Regency Inn, Inc. v. James N. Ellis, Jr., Civil No. 94-7521 (Middlesex Sup. Ct. July 9, 1998). In that affidavit, one of the assistant attorneys general prosecuting this case stated that one particular IFB investigator played a “central role" in the Fraud Division’s investigation and prosecution of this criminal matter, including access to prosecutorial work product, while under the “direction and supervision” of the Fraud Division assistant attorneys general.
On closer review, however, there is no real conflict between the assistant attorney general’s affidavit and a January 1998, affidavit provided by the IFB’s vice-president of administration, the affidavit to which the defendant directs this Court’s attention. In that affidavit, the witness merely stated that, when IFB investigators provide assistance to the Fraud Division, they are not “assigned or supplied” to the Fraud Division for exclusive use, but “remain under the authority of [the] IFB’s management structure.”

 Some cases concerning prosecutorial disinterest are not as clear as others regarding whether they are relying on substantive or procedural due process rights. Compare Lilly, 983 F.2d at 309 (citations omitted) (substantive due process *690 violation occurs where prosecutorial conflict of interest "violates ‘fundamental fairness’ and is ‘shocking to the universal sense of justice’ ”) with Marshall v. Jerrico, Inc., 446 U.S. 238, 242 (1980) (procedural due process entitles a person to an “impartial and disinterested tribunal” in civil and criminal trials), and People v. Superior Ct. of Contra Costa County, 561 P.2d 1164, 1171 (Cal. 1977) (citations omitted) (“a fair and impartial trial is a fundamental aspect of the right of accused persons not to be deprived of liberty without due process of law”).

 By comparison, “ ‘[plrocedural due process’ requires that a statute or governmental action that has survived substantive due process scrutiny be implemented in a fair manner.” Aime, 414 Mass. at 674 (citations omitted). “The definition of the interest involved is also a threshold inquiry for procedural due process analysis because the ‘requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment’s protection of liberty and property’ " Id. at 675, quoting Regents of State Colleges v. Roth, 408 U.S. 564, 569 (1972).

 It is clear to this Court that the conduct at issue here (the charging of indictments arising out of the enactment of a legislatively-created financing scheme) could hardly be said to shock the conscience of this Court. See Brown v. Hot, Sexy and Safer Prod., Inc., 68 F.3d 525, 531-32 (1st Cir. 1995), cert. denied, 516 U.S. 1159 (1996) (absent “mean-spirited brutality” court’s conscience not shocked); Lilly, 983 F.2d at 309-10 (de minimis nature of prosecutor’s misconduct did not shock court’s conscience).

 The defendant’s inference that insurance companies who are members of the AIB and WCRIB will only continue to be members, and provide the money which ultimately funds the IFB and the Fraud Division, as long as “their” cases are prosecuted is speculative at best.

 The in-kind support the IFB provides the Fraud Division is distinguishable. That support, as noted supra, is part of the “customary . . . ongoing investigatory support” the IFB investigators provide the Fraud Division. Sbordone, 424 Mass. at 804 n.3.

 The defendant makes much of the fact that, although the legislative scheme provides for the prosecution of insurance companies for fraud, the Fraud Division has failed to prosecute a single insurance company for defrauding claimants. That issue will be addressed in more detail in this Court’s upcoming decision on defendant’s motion to dismiss based on the selective prosecution theory.

 That the prosecutions are in the public interest is aptly demonstrated by the costs associated with insurance fraud and passed on to consumers. See Longval, 59 Cal.Rptr.2d at 468, 51 Cal.App.4th at 801 (before amendments reforming workers’ compensation system, California “premium costs were among the nation’s highest and the weekly benefits paid to injured workers were among the lowest”); Fremont Comp. Ins. Co., 52 Cal.Rptr.2d at 217, 44 Cal.App.4th at 877 (costs of insurance fraud “indirectly borne by all consumers, employees and businesses”).

 It also bears repeating that neither the IFB nor any single insurance company funds the attorneys’ salaries either directly or indirectly. That statutory responsibility falls solely on the AIB and WCRIB, organizations which apparently have less contact with the Fraud Division than does the IFB.

 For example, G.L.c. 12, §11E authorizes the Attorney General to intervene on behalf of consumers in regard to utility rates, and, until its repeal in July 1996, G.L.c, 6A, §9A authorized the secretary of consumer affairs and business regulation to annually assess each electric, gas, and telephone company for the costs of those interventions, including the personnel costs of the Office of the Attorney General. As discussed supra at note 27, G.L.c. 12, §11F authorizes the Office of the Attorney General to intervene on behalf of consumers regarding insurance rates, charges, premiums and prices, and G.L.c. 26, §8F authorizes the commissioner of insurance to levy assessments against insurance companies to fund those interventions.
At oral argument, the defendant asserted that those funding arrangements are distinguishable from the one here, because in those situations the industries are funding the Office of the Attorney General as “opponent.” Here, conversely, the insurance industry is providing funds for the Fraud Division to use in assisting insurance companies recoup fraudulent claims. That argument, while troubling, does not alter this Court’s conclusion that the Fraud Division is acting as an impartial sovereign prosecutor in this case.

 The defendant is correct in his assertion that no prejudice need be shown where “[a] prosecutor has a personal interest in the outcome of a criminal trial." Commonwealth v. Pisa, 378 Mass. 724, 729 (1979), citing Tabor, 376 Mass. at 817-820, and Sinclair, 363 A.2d at 475 n.8; however, because this Court finds that the assistant attorneys general here have no personal financial interest in the instant prosecution, it need not reach the issue of whether the defendant has been prejudiced.

 Article 5 provides that “All power residing originally in the people, and being derived from them, the several magistrates and officers of government, vested with authority, whether legislative, executive, or judicial, are their substitutes and agents, and are at all times accountable to them.”

 Article 6 provides that “No man, nor corporation, or association of men, have any other title to obtain advantages, or particular and exclusive privileges, distinct from those of the community, than what arises from the consideration of services rendered to the public; and this title being in nature neither hereditary, nor transmissible to children, or descendants, or relations by blood, the idea of a man born a magistrate, lawgiver, or judge, is absurd and unnatural."

 Article 7 provides “Government is instituted for the common good; for the protection, safety, prosperity and happiness of the people; and not for the profit, honor, or private interests of any one man, family, or class of men; Therefore the people alone have an incontestable, unalienable, and indefeasible right to institute government; and to reform, alter, or totally change the same, when their protection, safety, prosperity and happiness require it.” Articles 6 and 7 have been construed together to provide equal protection rights. See Opinion of the Justices, 408 Mass. 1215, 1223 (1990) (citation omitted). Since the defendant makes no argument regarding equal protection, we need not linger long here.

 The defendant’s passing reliance on G.L.c. 268A, §3 (the gratuity statute) is clearly inapposite. The defendant makes no claim that the IFB or an insurance company has attempted to bribe the Fraud Division into changing its prosecutorial policies. See United States v. Sawyer, 85 F.3d 713, 735 (1st Cir. 1996) (offense of violation of Massachusetts gratuity statute consists of bribery without corrupt intent).
Likewise, the defendant’s reference to the Massachusetts Rules of Professional Conduct, particularly S.J.C. Rule 3:07, MRCP 1.8(f), yields nothing. The Commonwealth is not “accepting compensation for representing a client,” as it represents the public interest, and does not have a “client.” See Secretary of Admin. & Fin. v. Attorney General, 367 Mass. 154, 163 (1975) (citations omitted) (Attorney General “has a common law duty to represent the public interest”).

 The defendant’s arguments regarding the Fraud Division’s statutory authority to prosecute the CLEO Loan Co. scheme, in which this defendant, Lenora Ellis, Nicholas Ellis and James N. Ellis, Sr., were indicted for illegal and usurious loans, has been addressed in this Court’s memorandum on Lenora Ellis’s Motion to Dismiss, dated July 23, 1998.